PRATT and others, assignees of Rathbun, *vs.* ADAMS and others.

Where a debtor, who was in insolvent circumstances, made an assignment of all his property and effects for the benefit of his creditors, and directed his assignees, among other preferred debts, to pay and satisfy to the Bank of the United States, and to some other creditors particularly named in the assignment, the amount of certain specified notes which were held by them respectively; and where, upon a bill filed by the assignees, for the purpose of having the trust fund distributed among the several creditors entitled thereto under the assignment, it appeared that those notes had been discounted by the holders thereof at an usurious rate of interest; *Held*, that as the payment of these notes was specifically provided for in the assignment, the other creditors of the assignor, who came in to claim their distributive shares of the fund under such assignment, could not raise the objection that the notes were usurious, for the purpose of depriving the holders of the notes of their rateable shares of the fund to the extent of the money actually loaned upon the notes, with the legal interest; but that the holders of the notes must deduct the amount of the usurious premiums received by them upon the discounting of the notes.

And where such assignor, by his assignment, directed that all persons to whom he was indebted for money lent˜ should be included in the class of preferred creditors, and some of his creditors proved that their debts arose upon the sale or advance to him of uncurrent bank notes, of other states, which were at a discount of from two to three per cent in the money market; under an agreement with him that he should pay the whole nominal amount of such depreciated bank notes in current funds, at the expiration of thirty days; *Held*, that these debts were not entitled to be placed in the preferred class, under the assignment; and that these agreements, for the exchange of the depreciated or uncurrent bank notes for current money, at the end of thirty days, if intended by the parties as loans of money at a greater profit to the lenders than at the rate of seven per cent per annum, and not as mere sales of depreciated securities for money, were usurious and void. *Held also*, that under this provision in the assignment, a promissory note of the assignor, or his check upon a bank, was not of itself evidence of money lent to him by the holder of such note or check; so as to entitle such holder to be placed in the class of preferred creditors, without further proof of the consideration for which the note or check was given.

Where the assignor, as a part of the class of his preferred debts under the assignment, directed his assignees to pay to H. J., his agent in New-York, and to several other persons named therein, the amount of all such notes, checks, or drafts, as they or any of them had made, endorsed, or accepted for his accommodation; *Held*, that the owners of the several notes and drafts which had been endorsed or accepted, for the accommodation of the assignor,

1839.

Pratt
v.
Adams.

by H. J., previous to the execution of the assignment, and which notes and drafts he was legally liable to pay to the holders thereof by reason of such endorsements or acceptances, were entitled to be placed in the class of preferred creditors, in the distribution of the assigned fund ; as H. J. would himself have been placed if he had actually paid and taken up such notes and drafts with his own funds. *Held also,* that the owners of certain drafts, which had been accepted by H. J., for the accommodation of the assignor, subsequent to the execution of the assignment but before he was aware that such an assignment had been made, were not entitled to be placed in the class of preferred creditors ; and that the holders of certain usurious notes which had been endorsed by H. J. previous to the execution of the assignment, which notes he was not legally holden to pay, in consequence of the usury, were also excluded from a preference under that provision in the assignment.

The possession, by an endorsee, of a negotiable promissory note or of a bill of exchange, is presumptive evidence, not only of the fact that it was transferred to him upon a good consideration, but also of the fact that it was thus transferred before it was due and dishonored.

Where a note is discounted at a bank, at the rate of seven per cent per annum for the time such note has to run, under an agreement between the borrower and the officers of the bank, that he shall receive the money lent in the bills of such bank and will at his own expense cause such bills to be kept in circulation until his note becomes due and payable, the agreement for such loan is usurious and void, by the usury laws of this state.

A contract for a loan of money, at a rate of interest which is allowed by the laws of the state where such contract is made, and where the money is actually to be loaned, is a valid and binding contract, although by the terms of the contract the money is to be repaid in another state, where the legal rate of interest is less ; if the making of such loan in the state where the contract is made, is not a mere device of the parties to the agreement, to evade the usury laws of the state where the money is to be repaid.

But it seems that a contract made out of this state, by persons residing here, for a loan of money at a higher rate of interest than is allowed to be taken here, cannot be enforced in the courts of this state ; provided it can be shown that the making of the contract for the loan in another state, was a mere device of the parties, to cover an usurious premium for the use of the money, and to evade the operation of the laws of this state upon such contract.

Where the notes of a citizen of this state were made and endorsed here, and were discounted by a bank in another state, for the benefit and accommodation of the drawer, under an agreement or understanding with his agent, that bills of that bank of a less denomination than five dollars, should be received by him and circulated in this state, in violation of the statute prohibiting the circulation of foreign bank bills under the denomination of five dollars within this state ; *Held,* that the contract for the discount of the notes was illegal and void, and that no suit could be sustained by the bank upon such notes, either against the drawer or the endorser.

It is a settled principle of the common law that no court will lend its aid to enforce the performance of a contract which is contrary to public policy,

or any contract or agreement which was intended by the parties to contravene the provisions of a positive law.

Where upon an application to a bank for a loan of money, upon a discount of notes, it was agreed that if the notes were discounted the borrower should receive bills of exchange, for the amount of the loan, at a higher premium than the cash value of such bills; *Held*, that the discount of the notes was illegal and usurious; and that the legal effect of the transaction would not be altered by proving that there was a custom, among the sellers of bills of exchange, to charge a higher premium for their bills when they sold on a credit than when they sold for cash.

Whether an assignment to trustees, for the benefit of the creditors of the assignor, which assignment intentionally provides, among other things, for the payment of usurious loans, together with the illegal premiums agreed to be paid by him upon such loans, is not of itself illegal and void under the usury laws, so that no title to the property vests in the assignees by such assignment; *quære?*

A general provision for the payment of debts, in an assignment of property for the benefit of creditors, will not include debts which are founded upon usurious considerations; but to enable the usurers to obtain payment of their debts, out of the fund in the hands of the assignee, the assignment must contain a clear indication of an intention on the part of the assignor that the usurious debts should be paid, as well as debts which are legal and valid.

The seventy third rule of the court of chancery, only provides for the case of an examination of a defendant as a witness, against another party to the suit, previous to a hearing of the cause. It does not authorize the entry of an order of course, to examine a defendant as a witness, subsequent to the hearing; upon a reference to a master to take and state an account.

The legal principle, upon which an interested witness is rejected as incompetent to give evidence in his own favor, is that his interest may induce him to testify to that which is untrue. Where his interest, therefore, is of such a nature that he cannot be benefitted, by swearing to the matters which he is called to prove, unless they are really as he states them to be, it is no legal objection to his competency as a witness, that he may be benefitted by the proof of those matters if his testimony is in fact true.

THIS case came before the chancellor upon various exceptions which had been taken, by different creditors, to the report of the master as to the several debts due and owing by the defendant B. Rathbun, and as to the classes in which debts were entitled to be placed under the assignment which he had made to the complainants for the benefit of creditors. The assignment was executed at Buffalo, where Rathbun and his assignees then resided, on the first of August, 1836. And he thereby conveyed all his property and effects to the complainants, in trust, to convert the same

July 16.

into money, and to apply the same, *first*, to pay the expenses of executing the trust; *secondly*, to pay and satisfy the debts, liabilties, and responsibilities named and set forth in the schedule B. annexed to the assignment; and *thirdly*, to pay and satisfy all his other creditors not named or embraced in the schedule B. The debts, *liabilities and responsibilities* embraced in that schedule, and to which the assignees were directed to give a preference in payment, were as follows:

To clerks, mechanics, and daily laborers in the employ of Rathbun at Buffalo and Niagara Falls, the amounts due to them respectively.

To the Bank of the United States the amount of his notes which it held, endorsed by Horace Janes, amounting to $80,000.

To H. Janes of New-York, B. Humphrey of Batavia, W. Forsyth and N. Forsyth of Canada, and to N. Darrow, Kimball and Hadduck, D. Grider, T. Day, D. Burt, H. H. Sizer, Townsend & Coit, Williams & Baldwin, S. H. Macy, M. B. Sherwood, H. Roop, Johnson, Hodge & Co., S. Wilkinson, G. H. Goodrich, Goodrich & Stebbins, A. Palmer, N. K. Hall, J. W. Skinner, S. Matthews, and M. Daily, of Buffalo, *the amount of all such notes, checks or drafts as they or any of them had made, endorsed, or accepted for him, or for his accommodation.*

To Wood & Bogert of New-York $50,000, being the amount of some of his notes guarantied by them; the securities in their hands, and the securities in the hands of the other creditors before named to be first applied to the payment of their respective claims.

To John Ward & Co. of New-York $20,000, lent to H. Janes for him; if the same had not been paid to them by Janes.

To Hiram Pratt, or John Ward & Co. $15,000, being the amount of three notes made by Rathbun for $5000 each, due about the middle of October then next.

Two thousand dollars to the holders of his small engraved notes of the denominations of one, two, three, and five dollars.

To Shipman, Corning & Co. of New-York, $10,000, being the amount of two notes of $5000 each held by them.

To any and all persons residing in the city of Buffalo, such amounts as he owed to them for money lent to him.

And to all persons residing in the counties of Erie, Niagara, and Chautauque, to whom he was indebted for building materials, horses, or other personal property purchased for the purpose of carrying on his business operations, such sums as he was indebted to them therefor.

The assignees filed their bill in this cause against B. Rathbun, the assignor, and against several hundreds of other persons and banking corporations who were supposed to be his creditors, for the purpose of having the debts due to the creditors ascertained and their several priorities established, so that the proceeds of the assigned property might be distributed among the several persons interested therein under the assignment, according to their respective rights. Many of the defendants were proceeded against as absentees, and the bill was taken as confessed against them and many others, for want of an appearance. And an arrangement was made between the complainants and those defendants who had caused their appearance to be entered, by which the bill was to be taken as confessed as to them also; reserving to each creditor all his rights on the reference to be made to a master, in the same manner as if he had come in and claimed such rights by his answer. The following decree was thereupon entered:

" The bill in this cause having been taken as confessed by all the defendants named therein; on motion of Mr. Reynolds, of counsel for the complainants, it is ordered that it be referred to Elijah Ford, Esquire, one of the masters of this court, residing in the city of Buffalo,

" *First*, To take and state an account of all property, money and effects which have come to the hands of the said complainants, as assignees of the said Benjamin Rathbun, under and by virtue of the assignment mentioned in the bill of complaint; and of all property, money and effects which have come to the hands of Thomas C. Love and Millard Fillmore, or either of them, under and by virtue of the said

assignment, and which have not been paid over and delivered by them to the complainants, or accounted for by the complainants.

" *Secondly.* To take and state an account of all payments and disbursements made by the complainants, or by them and Thomas C. Love and Millard Fillmore, under and by virtue of the assignment; and particularly that the said master inquire into and report the facts and circumstances under which payments were made by the said complainants to the laborers, clerks and mechanics in the employ of the said Benjamin Rathbun, at the time of his stopping payment, as stated in said bill; and that the said master include in said amount all payments and disbursements made by the said complainants on any account whatever up to the time of taking and closing his report, and that the said master inquire into and report upon the validity of the assignment, pledge, or mortgage, of which a copy is given in schedule N., annexed to the said bill of complaint, whether the same was a specific lien on the property therein described, and whether the demand secured by the assignment and by the judgment to Lewis F. Allen, mentioned in the said bill, was entitled to be paid by the complainants; and that he inquire into and report any peculiar facts and circumstances under which any other payments or disbursements have been made by the complainants, which any of the parties may require him to examine into; and that he state also a separate account of the payments made to each creditor in schedule B., annexed to the first assignment; showing the amount paid to each and the time of payment, and whether the whole amount due or only a part was paid.

" *Thirdly.* To take and state an account of all expenses incurred by the said complainants, and by Thomas C. Love and Millard Fillmore, in the discharge of their duties as such assignees and trustees, and of all just allowances that should be made to them or any of them for their services in the execution of the trust committed to them by the first assignment; and to inquire into and report the facts and circumstances which equitably entitle them or any of them to

any such allowance ; and a like statement under the second assignment, if required by the said complainants.

" *Fourthly.* To take and state an account of all the claims and demands of every description against the said Benjamin Rathbun, existing prior to the execution of the assignment of the first of August, 1836, mentioned in the complainant's bill, and which are entitled to be paid out of the monies, effects, proceeds and securities which have come to the hands of the complainants, as assignees of the said Benjamin Rathbun, which are included in schedule B. ; and a like account of the claims under schedule C.

" *Fifthly.* To inquire into and report the order of priority in which the said claims and demands are entitled to be paid, and the facts and circumstances necessary to determine the said order ; and particularly, that the said master ascertain and report the amount of the claims of those persons who were the holders of the small engraved notes of the said Benjamin Rathbun, and the rate and mode of distribution among them, of the sums appropriated by the said assignment for their payment.

" *Sixthly.* The complainants and any creditor of the said Benjamin Rathbun who shall establish before the master any claims to any portion of the funds in the hands of the complainants, and who shall come before the master and consent to be examined on oath as to the validity of their own claims, shall be at liberty to contest before the master the validity and amount of any claims or demands that may be exhibited before him ; and to establish any legal or equitable defence that may exist to any such claims and demands, or any set off against them. And the several powers of the master given by the rules of this court to examine on oath any party, creditor, or person, coming in to claim before him, is hereby declared to extend to the examination of any such creditor, party, or person in relation to any claim or demand exibited to him. It is further ordered that if any creditor who has appeared in his suit, or who shall be specially summoned to appear and substantiate his claims before the master, neglects or refuses to be examined as to any usury or other illegality in such claim which

might be a cause of forfeiture, any other creditor, who has established his claim before the master and has consented to be so examined, may make a special application to the court for such directions in relation to the claim of the party so neglecting or refusing, as the court may deem just, upon due notice of the application to the party making such claim and so refusing to be examined. And where any witnesses whom any party may wish to examine, reside out of the county of Erie, instead of issuing a commission for their examination, they may be examined before a master in the county in which they reside, on interrogatories to be approved by the master to whom this reference is made, or *viva voce*, or both, as may be directed by the said master, and on giving such notice to such parties and persons as the said last mentioned master may direct, or on a commission to be issued on the certificate of the master who is charged with this reference ; and creditors and persons coming in to claim before the said master may be examined in relation to their respective claims, and as to the validity and true amount of such claims, and as to any legal or equitable defence against them not amounting to a forfeiture, and as to any payments or set offs, before the said master or before the master in the county in which they respectively reside, on written interrogatories, or *viva voce,* or in both modes, on the application of such creditors or persons to the master to whom this reference is made, and upon his order allowing such examination and specifying the notice thereof to be given, and the parties and persons on whom the same shall be served ; the said master to attend at Buffalo, Albany and New-York, for the purpose of taking proof of such claims and examining parties in relation thereto. And it is hereby declared that judgments against the said Benjamin Rathbun obtained by confession, default, or otherwise, since the execution of the said assignment of the first of August, one thousand eight hundred and thirty-six, shall not be deemed to be evidence of any valid demands against the trust funds in the hands of the complainants ; but said demands shall be established in the same manner as if such judgments had not been obtained.

1839.

Pratt
v.
Adams.

" *Seventhly.* To enable the said master to take and state the said accounts, he is to cause advertisements for the creditors of the said Benjamin Rathbun, and all other persons having claims and demands against the said Benjamin Rathbun, existing prior to the execution of the assignment of the first of August, one thousand eight hundred and thirty-six, who are not parties to the suit, and all parties to the suit, who shall be summoned to appear before the master on the reference in this cause, to come in and exhibit their demands before him by a day to be fixed by him for that purpose, not less than two nor more than three months from the first publication of such advertisement, or that they be debarred from all benefit of the assignments mentioned in the complainants' bill and the funds thereby appropriated; which advertisements are to be published once in each week for at least six weeks in the state paper and in a newspaper printed in the city of Buffalo, in the Evening Journal printed in the city of Albany, in the Commercial Advertiser and Journal of Commerce printed in the city of New-York. And such of the said creditors and persons having such claims and demands, who are not parties to this suit, or who are parties and shall be summoned to appear before the master, as shall not come in and exhibit their claims and demands by the time so limited, and such as fail to establish the validity and equity of their demands, shall be excluded from the said account so to be taken by the said master, and from the benefit of any decree that may be made in this cause; but it shall be the duty of the master, by the best evidence in his power, to ascertain and include in his report the amount due to creditors who are parties to this suit, but who are not summoned so to appear before the master to exhibit their claims; and for this purpose resort may be had to the books of said Rathbun.

" *Eighthly.* And for the better taking the said accounts and the discovery of the validity and true amount of such claims and demands, the complainants and the parties who appear before the said master, and all persons coming in to claim before him, are to produce upon oath, before the said

master, all books, papers, and writings in their custody or power relating thereto as the said master shall direct.

" *Ninthly.* In taking and stating the account of payments, disbursements and expenses incurred by the complainants in and about the management of their trust, the said master is directed to credit them what shall appear to have been necessarily expended by them in finishing and completing any articles, the manufacture of which had been commenced by the said Benjamin Rathbun previous to his aforesaid assignment, and which were left by him in an unfinished and unsaleable condition; and also what shall appear to him to have been necessarily expended by them in completing any contracts entered into by the said Benjamin Rathbun, previous to the said assignment, for the erection of buildings or the performance of other works, where such contracts had been in part performed, but not entirely completed; and all other just and necessary expenses in preserving, maintaining, keeping and repairing any property assigned to them by the said Benjamin Rathbun; and in ascertaining and perfecting the title to any real estate assigned to them by him; and in general, all their just expenses which have been incurred in the management of their trust. And it is further ordered, that the complainants be at liberty from time to time to deposit with the New York Life Insurance and Trust Company, any monies which may come to their hands in the execution of their said trust; said monies to be deposited to the credit of this cause. The said master is to report with all convenient speed on the matters aforesaid, to which report any of the parties may except in the usual form, and all other and further directions are reserved until the coming in of the report, when the complainants or any of the defendants who have established claims before the master, may apply for such further directions as to them shall seem expedient."

It appeared by the complainant's bill that the amount of mortgages upon the real estate of the assignor was something more than half a million of dollars. Independent of these specific liens upon that part of the assigned property, claims were presented to and allowed by the master, to an

amount exceeding a million of dollars; of which amount, $380,939 was allowed by him as belonging to the class of preferred debts under the assignment. And claims to the amount of two hundred and twenty-five thousand dollars, which were attempted to be established, were rejected by him as usurious and void ; among which was the claim of $80,000 in behalf of the Bank of the United States in Pennsylvania, the notes to the amount of $50,000 guarantied by Wood & Bogert, and one of the $5000 notes to John Ward & Co. All of which were referred to in schedule B., annexed to the assignment as preferred debts. The whole proceeds of the assigned property, after paying the incumbrances upon that part of the real estate not mortgaged for more than its value, were only estimated by the master at $300,000, after paying the expenses of the trust. As it was thus evident that the amount to be distributed would not be sufficient to pay the preferred debts, the principal struggle before the master, among those creditors whose claims were not rejected entirely, was, as to who should be placed in that preferred class. The several exceptions to the report, therefore, related to that question, and to the rejection by the master of many of the claims, on the ground of usury.

*S. G. Haven & M. T. Reynolds,* for the complainants.

*H. K. Smith,* for the Bank of Buffalo, The Commercial Bank of Buffalo, Rochester & Co., H. H. Sizer, and Johnson, Hodge & Co.

*S. Stevens,* for John Ward & Co., H. Pratt, and R. L. Allen.

*A. Taber,* for G. C. White, The Commercial Bank of Sciota, L. Dunbar, The Ohio Life Ins. and Trust Co., M. B. Sherwood, O. Allen and I. Miller.

*E. H. Blatchford & S. Stevens,* for The Bank of the United States, Christmas, Livingston & Co., and Shipman, Corning & Co.

*T. Hastings*, for C. Tainter, M. Daily, W. Williams and J. J. Baldwin.

*W. L. G. Smith*, for The Granville Alexandrian Society, Pomeroy & Co., and A. A. Eustaphieve.

*J. C. Spencer*, for the Bank of Utica and for the Granville Alexandrian Society.

*M. T. Reynolds*, for R. H. King & Co., and H. Bleecker, jun.

*Le Grand Marvin*, for the Erie Bank in the county of Erie.

*E. Griffin*, for the Bank of Worcester.

*W. Kent*, for State Bank at Elizabeth and W. B. Bend.

THE CHANCELLOR. The Granville Alexandrian Society produced and proved before the master eight drafts, drawn by B. Rathbun on H. Janes, and accepted by the latter for the accommodation of the drawer. These drafts were all discounted at the Granville Bank, and were owned by the society previous to the assignment, and were afterwards protested for non-payment, and due notice thereof was given to the drawer, endorsers, &c. The three first drafts were accepted by Janes before the assignment, and the other five on the third of August, 1836, before he heard of the assignment. The whole of the drafts remain in the hands of the claimants unpaid ; Janes being insolvent and unable to pay them. The master arrived at the conclusion that drafts or notes accepted or endorsed by Janes for the accommodation of Rathbun and which he was liable to pay at the time of the assignment, could not, when allowed to the holders, be placed in the class of preferred creditors. In other words, that the mere liability of Janes to pay the drafts, if he did not actually pay them, would not enure to the benefit of the holders so as to entitle them to a prefer-

ence. He therefore placed the three drafts upon which Janes was liable as acceptor previous to the assignment, as well as those on which he became liable afterwards, in the last class. The first exception of these claimants which relates to the three first drafts, is certainly well taken. This provision in the assignment was intended as an indemnity to Janes and other accommodation acceptors and endorsers against their liabilities, and to furnish them with a fund to discharge those debts. And it has been settled by a long course of judicial decisions, that where a person standing in the situation of endorser or surety is furnished or provided, by the principal debtor, with a fund or with collateral security for such a purpose, the creditor is in equity entitled to have it applied in satisfaction of the debt. (*Maure* v. *Harrison*, 1 *Eq. Cas. Abr.* 93. *Wright* v. *Morley*, 11 *Ves.* 22. *Ex parte Perfect, Mont. Rep.* 25. *Ex parte Prescott*, 3 *Dea. & Chitty's Rep.* 227. *Ex parte Waring*, 2 *Glyn & Jam. Rep.* 404. *Ex parte Parr, Buck's Rep.* 196. *Moses* v. *Murgatroyd*, 1 *John. Ch. Rep.* 129. *Bank of Auburn* v. *Throop*, 18 *John. Rep.* 505. *Haggerty* v. *Pittman*, 1 *Paige's Rep.* 299. *Keyes* v. *Brush*, 2 *Id.* 311.) The first exception of these claimants must therefore be allowed. The second and third exceptions relate to the drafts which were not accepted until after the assignment. I have endeavored to find some principle upon which these drafts could be placed in the class of preferred debts also; as that is the only way in this case in which the creditors can be put upon the footing of equality. I cannot, however, make a new trust which is different from that created by the assignment, for the purpose of producing that equality. The legal construction of the assignment only extends the preferences to those debts upon which Janes and others had actually assumed responsibilities for Rathbun at the time that assignment was made. If the case which has occurred had presented itself to the mind of the assignor, he probably would have made a provision for indemnifying Janes against any acceptances he might afterwards make before he heard of the failure of the drawer. No such provision, however, was inserted in the assignment. And as the holders of the

1839.

Pratt
v.
Adams.

draft, which had not then been accepted had no equitable right of preference under the assignment immediately after it was executed, other creditors have acquired rights under it, which could not be impaired by the subsequent acceptances of Janes. The second and third exceptions of these claimants must therefore be overruled. No costs are allowed to either party on these exceptions, except the costs of the complainants which they are to be permitted to retain out of the fund in their hands as trustees.

H. Pratt presented a claim upon a draft drawn by B. Rathbun upon Janes, and accepted by him for the accommodation of the drawer, on the 21st of July, 1836. And the report is excepted to on the ground that this debt was not placed by the master in the preferred class. For the reasons stated in relation to the first exception of The Granville Alexandrian Society, the report in respect to this claim is erroneous. The exception is therefore allowed, with costs to the exceptant, to be paid out of the fund in the hands of the trustees.

R. L. Allen presented and proved five drafts, drawn in May, June and July, 1836, by B. Rathbun, in favor of L. Rathbun, and endorsed by the latter, amounting to $14,000 and accepted by Janes for the accommodation of the drawer, payable four months after date. And the claimant excepts to the report, because these drafts are not put in the list of preferred debts. If these drafts had been negotiated to the claimant, or to any other bona fide holder thereof previous to the assignment, or if any person had received them at any time before they became due and were dishonored, upon a full consideration paid for them, and without notice that Janes was a mere accommodation acceptor, they would certainly all be entitled to be placed in the class of preferred debts, upon the principles before stated in relation to the first exception of the Granville Alexandrian Society. It appears, however, from the claimant's own examination, that he became possessed of all these drafts after they were due and dishonored ; and that he received one of them subsequent to the decree in this cause, from L. F. Allen, one of the trustees. It is not improbable, therefore, that these

drafts, which were accepted for the accommodation of B. Rathbun, were still in his hands, or in the hands of some of his agents at the time of the assignment. If so, Janes was not then liable as the acceptor; and the subsequent transfer of the drafts after the drawer had become insolvent, was a fraud upon the accommodation acceptor. And to entitle the present holder of these drafts to recover against Janes, he or those from whom he received them must have taken the drafts in the usual course of business, and without notice of the intended fraud; in which case Janes would be liable to him for the amount actually paid by him or the previous bona fide holder. (*Wardell* v. *Howell,* 9 *Wend. Rep.* 170.) If Janes is not liable to this claimant as the acceptor of these drafts, it follows, of course, that they cannot be placed in the class of preferred debts. The proof before the master as to when the four drafts which the claimant received from the Ohio Life Insurance and Trust company got into the hands of that institution and under what circumstances, or whether any or what consideration was paid by the claimant for these drafts, which were received by him of the company after they had become due, is entirely deficient, except what is to be legally inferred from the endorsements of L. Rathbun, who was one of the agents of the drawer. But these endorsements, in the absence of any circumstances to raise a suspicion to the contrary, are presumptive evidence of the fact that the first four drafts were transferred to the bank from which the claimant received them, upon a good consideration, and immediately after their respective dates, or at least before they became due and were dishonored. (*Pinkerton* v. *Baily,* 8 *Wend. Rep.* 600.) The *onus,* therefore, of rebutting the presumption that the Ohio Company were the owners and holders of those four drafts, lay upon those who objected to their being placed in the class of preferred debts. The draft which the claimant received from L. F. Allen, one of the complainants and trustees, subsequent to the order of reference, stands upon a different ground. And I think there is sufficient in the case to rebut the presumption that this last mentioned draft was endorsed to L. F. Allen at the time of

its date, or under circumstances which entitled it to be placed in the preferred class, while it remained in his hands. If he was not entitled to claim it as belonging to that class, his assignee who has received it from him *pendente lite* stands in no better situation. In the bill in this cause, L. F. Allen and the other complainants state the names of the several persons who have exhibited claims against the estate ; and schedules are annexed to the bill of the debts which they claim to belong to the preferred class. Schedule J., which is thus annexed, states L. F. Allen as the claimant of a preferred debt to the amount of $47,88, but states nothing of any such claim upon this draft which he transferred to the present holder a few days before it was proved before the master. If this draft was in the hands of one of the complainants at that time, and was entitled to a preference, it should have been so stated in the bill if he intended to claim such preference upon the presumption of a transfer at the time of its date, and for a good consideration, arising from the mere fact of the blank endorsement of Lyman Rathbun. And if it has been purchased by him since the assignment, he could not, as a trustee of the fund, hold it for any greater amount than he actually paid for it. The case is perhaps susceptible of a satisfactory explanation, but as none was given upon the taking of the proofs as to this claim before the master, it ought not to be allowed as a preferred debt without further explanation. The exception must therefore be allowed so far as relates to the drafts received from The Ohio Life Insurance and Trust Company and disallowed as to the other draft, without costs to either party on this exception. If the claimant, however, or any creditor who has proved a debt entitling him to be placed in the preferred class, wishes a further investigation before the master in relation to the claim of preference as to either of these drafts, he may, upon filing a written request with the register at any time within ten days after the delivery of this opinion, have an order referring back this claim to the master for that purpose, and directing him to place the several claims in the class and for the amounts which such subsequent proofs, in connection with what has

1839.

Pratt
v.
Adams.

before been taken, shall show to be proper upon the principles above stated. And in that case he is to make a separate report on the subject, with liberty to except to the same in the usual manner.

The exception of the Ohio Life Insurance and Trust Company is well taken, for the reasons stated in relation to the first exception of the Granville Alexandrian Society. Janes testifies to the fact of their having been accepted by him for the accommodation of Rathbun, and by the special direction of one of his agents. And on a careful examination of his testimony, I think he refers to the whole seven drafts in that part of it in which he says, " I have no doubt that I accepted them before the assignment." The exception is therefore allowed with costs to the exceptant to be paid out of the fund in the hands of the complainants.

The exception of the Commercial Bank of Sciota, as to the four drafts proved by that company, must be disposed of in the same manner as the last, and for the same reasons.

The exception of the Bank of Worcester is for not placing in the preferred class the amount of two drafts on Janes, and accepted by him for Rathbun's accommodation, on the third of August, 1836, payable in the city of New-York, the one at sixty, and the other at ninety days sight. These drafts were discounted at the bank in the state of Ohio, at the rate of six per cent per annum, for the benefit of Rathbun, under an agreement made by his agent with the bank, that their bills, which were received by him and marked with the letter R, should be kept out until the drafts became payable. And it was a part of the agreement, that if the bills were returned to the bank before the drafts arrived at maturity, Rathbun should put the bank in funds to pay the bills so returned. Two objections are made to this claim of preference, in addition to the objection which was overruled in relation to the first exception of the Granville Alexandrian Society. *First*, it objected that the arrangement made with the bank was usurious ; and *secondly*, that the drafts had not been accepted by Janes at the time of the assignment. The exception to the master's report must be overruled on this last ground, for the reasons which have been stated in rela-

1839.

Pratt
v.
Adams.

tion to other drafts which were in the same situation in that respect. But as one question in relation to the supposed usury is applicable to some of the other exceptions which I am to consider in this case, I may as well examine it here. There is no evidence what the rate of interest is in Ohio, or that there is any law of that state rendering a contract void on the ground of usury. I believe as a matter of history, that the rate of interest in that state is fixed at six per cent, and that a contract for a greater amount only renders the contract void for the excess. At least such was the law, as appears by the reports of that state, as late as December, 1835. (*See Lafayette Benefit Society* v. *Lewis,* 7 *Ham. Ohio Rep.* 81.) If the case is therefore to be governed by the law of the state where the contract was made and the note discounted, this objection is untenable; as Janes the acceptor was legally liable to pay the drafts to the holders thereof. And if the contract was not illegal by the laws of the country where it was made, and where the money was loaned, the fact that the drafts were payable in New-York, would not render them void under our usury laws; except in a case where the loan of the money out of this state was a mere device to evade the operation of the law of this state, and was intended as a cover for usury. (*Depeau* v. *Humphreys,* 20 *Mart. Rep.* 1. *Chapman* v. *Robinson,* 6 *Paige's Rep.* 634.) In the case last supposed, of a contract made out of this state, by persons residing here, and intended as a mere device to cover an usurious loan made in fraud of our laws, the courts of this state would probably consider the contract void, whether by the terms of the contract itself the money was made payable here or elsewhere. But this is clearly not a case of that description; although the contract would have been usurious according to our laws if seven per cent discount had been taken on the drafts, in addition to the absolute agreement to prevent the return of the bills until the draft became payable. On the other ground of objection, the exception must be overruled, with costs to the complainants and to the solicitors of such of the preferred creditors as appeared upon the hearing of this exception.

Daily was the holder of nine checks drawn by Rathbun on the bank of Buffalo, payable to C. Tainter & Co., or bearer, amounting to about $6500, which the master has not placed in the class of preferred creditors; and the report is excepted to on that ground. At the time of the assignment these checks belonged to Daily and his co-partner Tainter, both of whom resided in Buffalo; and upon the division of the effects of the partnership, they fell to the share of Daily. There is no evidence to show what was the original consideration for these checks, except the testimony of Gibbs, that they were taken in exchange for previous checks which were held by the firm. And Tainter, the former partner of the claimant, who was examined as a witness for him in relation to other matters, is not called upon to give any explanation on the subject. Under these circumstances the court is called upon as a matter of law, to presume the consideration was money lent; for the purpose of placing this debt in the preferred class. The counsel has referred to cases to show that negotiable notes and checks for money may be recovered under money counts. And some of the cases establish the principle that they may be so recovered although there is evidence to show the actual consideration was not money but something else. This shows that it is a mere rule of pleading, which has no application to the question as to this claimants' right to priority under this assignment. Here the preference in payment was not intended to be given in favor of those whose claims came within a mere technical rule of pleading. But the assignor intended to prefer his Buffalo creditors whose debts were actually for money lent to him. If A. should covenant to pay B. all the money he should lend to a third person, it certainly would not be sufficient for B., in an action against A. upon the covenant, to produce the note or check of such third person, without some further evidence to satisfy the court and jury that the consideration of such note or check was money lent to him by B. The decision of the master was therefore right as to this claim; and the exception must be overruled with costs.

The claim of Tainter is for several other checks of the same description, which fell to him in the division of the

**1839.**

Pratt
v.
Adams.

partnership property, and upon two notes, one of which Rathbun has endorsed as surety for a third person ; and no proof was given that any of them were for money actually lent. The report is therefore right as to this claimant ; and his exception must be overruled with costs.

W. Williams has taken three exceptions to the report, which all go to the same point, that the master has not placed his note and checks in the list of preferred debts. This note, and the checks, originally belonged to Williams & Baldwin, and came to the claimant as one of the members of the firm. There is no evidence that they were given for money lent to Rathbun, or that they were endorsed by Williams & Baldwin for his accommodation. They were not, therefore, entitled to be placed in the class of preferred debts under any provision of the assignment. And these exceptions must be overruled with costs.

The first exception of Pomeroy & Co. is for not placing in the preferred class of debts two drafts upon Janes, and accepted by the latter for the accommodation of Rathbun. These debts belong to the preferred class, upon the principle established in relation to the first exception of the Granville Alexandrian Society. The master's report as to these two drafts is, therefore, erroneous. The second exception relates to three notes drawn by B. Rathbun, each for $2000, one of which was endorsed by L. Rathbun, to whom it was made payable. The holder of that note is prima facie the owner thereof ; but there was no evidence that it was given for money lent, and therefore could not properly be placed in the list of preferred debts. As to the other two notes, which are payable to the order of David E. Evans, and his name forged thereon as endorser, Pomeroy & Co. showed no right to claim them, even as the evidence of debts due to them from Rathbun ; as they do not show that he forged the endorsements thereon, or introduced any evidence to prove that the present claimants received those notes from him or any of his agents. The master, therefore, probably erred in putting them into either class of debts, upon the evidence which was before him. Clearly they were not entitled to be placed in the preferred class. The third exception is for

1839.

Pratt
v.
Adams.

not placing in the class of preferred debts, seven checks drawn by Rathbun, and dated in August, 1836, payable at different banks in Buffalo. If the private memorandum book kept by L. Rathbun is legal evidence, perhaps there is sufficient in connection with the other proof, to raise the presumption that he or some of the other agents of his brother forged the endorsements of Burt and passed off these checks to Pomeroy & Co. previous to the assignment. Still, however, there.is no evidence whatever as to what was the consideration, if any, which they gave for the checks. And to entitle them to be placed in the preferred class, it was necessary for the claimants to prove that the consideration was money lent to Rathbun. The draft on Janes referred to in the fourth exception, which was never accepted by him, could not properly be placed in the preferred class, as there was no evidence that it was given for money lent to Rathbun by Pomeroy & Co. The first exception of these claimants is, therefore, allowed, and the other three disallowed. And none of the parties are to have costs as against the others upon the exceptions.

L. Dunbar excepts to the report because his claim, amounting to nearly $19,000, was not placed in the class of preferred creditors. At the time of the assignment he was the holder of three notes given by Robert Bush and endorsed by Rathbun, the payment of which notes had been assumed by the latter subsequent to the giving of the notes. He also held four notes and seven checks, drawn by B. Rathbun, payable to the order of his brother L. Rathbun, and duly endorsed by the latter, upon which the names of various other persons as subsequent endorsers were forged ; and one forged check purporting to be drawn by W. Forsyth and duly endorsed by Rathbun and his brother. And he held fifteen other notes and checks drawn by Rathbun, payable to the order of different persons, whose names as endorsers thereon, as well as the names of subsequent endorsers, were forged.

As to the Bush notes, it is perfectly evident that they were not for money lent to Rathbun ; for the consideration upon which the latter assumed the payment of those, is

proved to have been the purchase of a carriage establish-
ment, consisting of both real and personal estate.   And the
possession of the other notes and checks, upon which the
names of the payees are forged, is not even evidence of a
claim against Rathbun for any thing ; much less are they
evidence that he received them from Rathbun or his agents
upon a loan of money to him.   And as to the notes and
checks which were legally negotiated by the genuine signa-
tures of the payees, as I have before held in relation to
other claims, the bare possession of them is not evidence
that he received them upon a loan of money to Rathbun.
As the claimant was a broker, it is much more likely that
these notes and checks, or at least a considerable number
of them, were purchased by him from those who had re-
ceived them of Rathbun or his agents in some of the numer-
ous business transactions which he was carrying on.   There
is some evidence that the claimant occasionally lent money
to Rathbun ; but that was not sufficient to authorize the
master to presume that all of these notes and drafts were
given to the claimant as securities upon such loans.   Al-
though it is deeply to be regretted that so many honest men
have been defrauded of their property by the innumerable
forgeries of Rathbun and his accomplices, I do not see any
principle upon which I can legally place the demands of
Dunbar in the class of preferred debts.   This exception
must therefore be overruled, with costs.

    The claim of the Bank of the United States in Pennsyl-
vania, which was specifically provided for by the assign-
ment, was rejected entirely by the master on the ground of
usury.   This claim arose upon sixteen notes of $5000
each, drawn by Rathbun, and payable to the order of Lewis
F. Allen and ten other persons, whose names were all forg-
ed as endorsers.   The notes were dated at Buffalo at dif-
ferent times, from the 18th to the 23d of June, 1836, and
were payable at one of the banks in the city of New-York,
nine of them at four months and the residue of them at six
months after date.   These notes were sent to Janes, as the
agent of Rathbun in New-York, to raise money on them,
and were subsequently endorsed by him.   In the latter part

of June, 1836, Janes placed these notes in the hands of R. M. Blatchford, for the purpose of having them discounted by the Bank of the United States, and agreed to allow four per cent a month upon their being thus discounted. Blatchford took them to Philadelphia and applied to the cashier of the bank to discount them, and agreed if he would do so, to take bills of exchange on England at ten or eleven per cent premium, which was two or three per cent more than the cash value of such bills in the market at that time. They were discounted accordingly, deducting at the rate of six per cent interest for the time the notes had to run, and payment was made in bills of exchange at the premium offered. Those bills were then sold in the market at their cash value; and the money, after deducting the bonus agreed to be paid to Blatchford for procuring the discount, was paid over to Janes as the agent of Rathbun and applied to the use of the latter. Both the cashier and Blatchford knew for whose benefit the discount was made, and the latter was therefore not requested to endorse the notes. The claimants offered to prove that it was the invariable custom of sellers of bills of exchange to charge more for them when they were sold on a credit than if they were sold for cash; but the master rejected the offer to introduce such proof as irrelevant. Two exceptions are taken by the bank to the report of the master; *first*, as to the rejection of the claim itself; and *second*, as to his refusal to receive proof as to the custom of bill sellers.

There can be very little doubt in this case that if these notes had been discounted in the state of New-York, upon this agreement to receive bills of exchange in payment at two or three per cent above their cash value, the transaction would have been usurious. The evidence offered as to the custom of bill sellers was irrelevant. If the custom had been proved to sell bills two or three per cent higher when they were sold on credit, it could not have altered this case, even if such a custom is legal when the seller supposes he is selling bills for the purpose of remittance and not as a mere device to raise money at more than seven per cent interest. Here the application to the bank was

1839.

Pratt
v.
Adams.

not an application to buy bills of exchange on a credit for the purpose of remittance. It was an application for a discount of these notes, for a person residing in Buffalo, and an offer to take bills of exchange in payment, at more than their actual cash value, instead of money. The decision of the supreme court of the United States, in the case of *Gaither* v. *The Farmer's Bank of Georgetown*, (1 *Peters' U. S. Rep.* 57,) is in point to show that the discount of these notes upon such an agreement would have been usurious according to our laws. There the understanding of the parties was that the person whose notes were offered for discount should take in payment post notes of the bank at a higher rate than their actual cash value, instead of taking the ordinary bills of the bank payable immediately; and that transaction was held to be usurious. The discount in this case however was not made in this state, and could not, by our laws, be made here by this foreign corporation. The contract must therefore be governed by the laws of Pennsylvania, although the notes were payable at a bank in New-York; as there is no foundation for a suspicion even that the notes were discounted out of this state for the purpose of evading the effect of our usury laws upon the contract. The usury law of Pennsylvania, which by stipulation of the parties was read in evidence before the master, is an act of the colonial legislature, passed in 1723. (*Purdon's Dig. 5th ed.* 547.) The first section of that act prohibits any person from taking more than six per cent per annum for the loan or use of money or any other commodities. And the second section provides, that if any person receives more than six per cent, he shall, upon conviction, forfeit the money or other things lent, one half to the governor for the support of government, and the other half to the common informer. The construction which has been given to this law by the courts of that state, for more than fifty years, has been that the contract made in violation of the law is not void except to the excess beyond six per cent. That there is no forfeiture in favor of the borrower; and that the usurer may sue and recover the money lent and legal interest, notwithstanding the existence of the general prin-

ciple in other cases that courts of justice will not give redress to a party suing upon a contract which has been made contrary to law. (*Wyckoff* v. *Longhead,* 2 *Dall. Rep.* 92. *Turner* v. *Calvert,* 12 *Serg. & Rawle,* 46. *Creed* v. *Stevens,* 4 *Whart.* 225.) The effect of the usury law of that state, according to this settled construction of it, is, that if the usurious premium is actually received, the usurer is liable to forfeit the whole amount of the loan, to be recovered in a qui tam action for the use of the state and the common informer; but that he has the legal right to recover the loan and legal interest from the borrower. Whether this statute applies to discounts made by the banks in that state, which by their charters are prohibited from taking greater discounts than at the rate of one half of one per cent for thirty days, which is about six and one-twelfth of one per cent per annum, has perhaps not yet been determined. But even if the general principle that a court of justice will not lend its aid to enforce a contract which is made contrary to the provisions of a statute, is applicable to usurious discounts by banks in that state, the amount of money actually lent upon these notes, with the legal interest thereon, formed a good consideration for a direction to the trustees in this case to pay that money to the bank out of the assigned property; and those who come as cestuis que trust cannot object to the legality of the assignment and the validity of the trusts therein contained. The first exception of the bank is therefore well taken and must be allowed, so far as to allow the notes, and place them in the class of preferred debts, after deducting the extra premium of two per cent at which the bank passed off the bills of exchange beyond their cash value; such extra premium not being either legally or conscientiously due from Rathbun according to the laws of Pennsylvania, where the debt was contracted. But the second, which relates to the offer to prove the custom of bill vendors, must be overruled; and neither party is to have costs on these exceptions.

Christmas, Livingston, Prime and Coster, presented and proved $50,000 of the notes of Rathbun specifically provided for in the schedule B., annexed to the assignment as notes

guarantied by Wood & Bogert of N. York. These were ten notes of $5000, dated in June, 1836, payable to the order of the eleven endorsers whose names were forged thereon, and were in other respects similar to the sixteen notes discounted by the Bank of the United States, about the same time, except that they were not endorsed by Janes. The notes were placed in the hands of Wood & Bogert, by Janes, as the agent of Rathbun, to raise money on them, and they obtained a discount of them by the present claimants at the usurious rate of forty-two per cent per annum, or three and a half per cent a month for the time they had to run ; and most of the money thus raised on them was applied in payment of a former loan from the claimants for the use of Rathbun at the same illegal rate of interest. And the claimants, at the time of the negotiation of the notes, took from Wood & Bogert a guaranty that the signatures of the drawer and of the several endorsers whose names appeared upon the notes were all genuine ; which is the guaranty referred to in schedule B., annexed to the assignment. These claimants also produced and proved another $5000 note of the same description, to which the genuine signature of Janes was affixed as a second endorser ; which note was also discounted by them for the benefit of Rathbun, at the rate of three and a half per cent a month. The master rejected the claim as to all these notes, on the ground of the usury ; and the claimants except to the report so far as relates to the disallowance of the ten notes guarantied by Wood & Bogert, and referred to in the schedule B., annexed to the assignment ; and they claim to have these notes placed in the list of preferred debts. These notes were clearly usurious and void in the hands of the claimants, who were the usurers, and who took the notes from the brokers of Rathbun before they had any legal existence as valid notes in the hands of any one. Indeed there could be no bona fide holders of these notes who could be protected as such under the provisions of the revised statutes; all the endorsements being forged, so that no one could trace title to the notes as an endorsee thereof. The loan of the money on these notes being void for usury, it follows, of course,

that the agreement to guaranty the genuineness of the sig-
natures of the drawer and endorsers, which was a part of
the same contract, was of itself inoperative and void. Or
if it should be said that the agreement of Wood & Bogert
to guaranty the genuineness of the notes was a separate
and distinct transaction, then it was clearly void for the
want of any consideration to support it. If the assignment
had specifically provided for the payment of these notes to
the holders thereof, as in the case of the sixteen notes to the
Bank of the United States, I should have no doubt as to the
right of these claimants to come in under the assignment
and to have their debts placed in the preferred class, at
least, to the extent of the money actually lent for the use of
Rathbun; notwithstanding the contract for the loan was
usurious and void. Whether an assignment for the pay-
ment of debts which intentionally provides for the payment
of notes, and other securities, together with usurious premi-
ums which are included therein, would not be of itself void
under our usury laws, is a question which the parties who
come in to claim under the assignment cannot raise. For
if the assignment is void, none of them are entitled to claim
a preference under it, and at the same to insist upon its ille-
gality in respect to the claim of others whose debts, wheth-
er valid or not, the assignor intended to provide for specifi-
cally. The cases arising under bankrupt and insolvent as-
signments are not applicable to the present case. There
the assignment, which is made according to the provisions
of the statute authorizing or directing it to be made, only
provides for the payment of such debts as could be recov-
ered against the bankrupt or insolvent himself, either at law
or in equity. It therefore follows, as a necessary conse-
quence, that every creditor who comes in to prove a debt
under such an assignment, must be prepared to show a
claim which was valid and recoverable against the person
whose property has been thus assigned. But in the case of
a voluntary assignment, where the assignor creates his own
trusts, a creditor who comes in to claim a share of the fund
under it, must be content to take such share of it as the as-
signor intended to give him; and cannot claim that which

was intended to be given to the assignees in trust for others. A creditor of the assignor, whether provided for by the assignment or not, who wishes to repudiate the trusts of the assignment on the ground that they are illegal and a fraud upon the honest creditors of the assignor, must apply to set aside the assignment as fraudulent and void against him as a creditor; instead of coming in under the assignment itself as a preferred creditor or otherwise. No court, however, will lend its aid either directly or indirectly to enable the usurer to obtain payment of usurious premiums, the receipt of which would subject him to a penalty under the laws against usury. Where he comes in, therefore, under an assignment which in terms provides for the payment of such premiums, in addition to the money actually loaned and legal interest thereon, he will not be entitled to any thing more than is honestly due. And the court will not compel the assignees to pay him that which he can neither legally or conscientiously receive. In carrying into effect these principles, the creditors who come in as claimants under this decree will be entitled to whatever is justly or conscientiously due, although their debts are tainted with usury; so far as the assignment itself either in terms or by necessary implication provides for the payment of such debts. A general provision, however, for the payment of debts, either in such an assignment for the benefit of creditors, or in a devise of real estate in trust to pay debts, will not include debts founded upon an usurious consideration, or a debt *ex turpi causa,* or those which are barred by the statute of limitations. To entitle the usurer to claim in such a case, there must be a clear indication in the assignment, or the will, of an intention on the part of the assignor, or testator, that the debts which are illegal and void should be paid out of the fund, as well as those which were legal and valid. Here the assignor has directed the notes held by the Bank of the United States, by John Ward & Co., and N. Pratt, and by Shipman, Corning & Co. to be paid directly to them. Those claimants, therefore, were entitled to be paid what was conscientiously due to them respectively, even if they could not have recovered the amount by any

suit at law or equity against Rathbun himself. But as to those notes, there is no evidence in this case to show that at the time of the assignment Rathbun or the assignees were aware that any of these notes were void for usury, or for any other cause, so as not to be legally recoverable against him. No inference, therefore, can be drawn, from the fact that he provided for the payment of those debts, that he intended to provide for other claims which now appear to be void for usury.

There is no direction in the assignment to pay the ten $5000 notes to Christmas, Livingston, Prime, and Coster. But the assignor, under the supposition that Wood & Bogert were legally holden, and would be compelled to pay these notes on account of their guaranty, has directed the amount of their supposed liability to be paid to them. This was unquestionably intended as a mere indemnity to them, for the purpose of enabling them to reimburse themselves for what he supposed they would be compelled to pay on account of their guaranty, and not for the benefit of the holders of the notes. And as it now turns out that the holders of the notes had no claim against Wood & Bogert, which could be enforced either at law or in equity, the principle that the creditor is in equity entitled to the benefit of a fund given by the debtor to his surety as a collateral security for his indemnity, has no application to the case of these claimants. Indeed, it appears from the testimony in relation to this claim, that before it was presented to the master the claimants had actually released and discharged Wood & Bogert from all pretence of claim which they might previously have had against them on account of the supposed guaranty. The exception, both as to the class in which the ten notes should be placed and as to the absolute disallowance of their claim as creditors of Rathbun, must, therefore, be overruled with costs. As the exception does not extend to the disallowance of the other note, which was endorsed by Janes, it is not necessary to say the same principles upon which the ten notes are rejected as a valid claim, apply with equal force to that note upon which Janes was never legally liable as endorser.

The note held by John Ward & Co. of $5000, which was rejected by the master, and two others of the same amounts, which were discounted by them at the same time, for the use of Rathbun, and probably for the same usurious premium of three and a half per cent a month, though the extent of the usury is not stated in the testimony, were clearly void in the hands of John Ward & Co., the original holders, who were themselves the usurers. But as the payment of these three notes directly to the holders thereof was specifically provided for in the assignment itself, other creditors who came in to claim under this decree could not object to the allowance of what was conscientiously due to Ward & Co. without repudiating the assignment itself. For the reasons before stated, therefore, this claim should have been allowed to the same extent. It appears, however, that two of those notes had, previous to the assignment, been passed off by Ward & Co. to Pratt, a bona fide holder, and he has therefore been allowed the full amount of those two notes, including the usurious premium reserved upon the original discount by Ward & Co. The claimants on the other note, which still remains in their hands, are only entitled in conscience, therefore, to receive the amount of that note after deducting therefrom the usurious premium retained upon the discount of the three. The exception is allowed to that extent only; and without costs to either party on the exception.

Eustaphieve of Buffalo presented and proved seven notes of Rathbun, amounting to $9,000, exclusive of interest. Two of these notes were placed by the master in the list of preferred debts as being debts for money lent to Rathbun by a person residing in the city of Buffalo. The other five he placed in the other class, on the ground that there was no sufficient evidence that they were given for money lent. If the answers of the claimant to questions put by the counsel of Dunbar and of some of the other creditors can be considered as legal evidence in his favor for the purpose of establishing the class to which these claims belonged, there can be no doubt that the exception that the five notes were not placed in the preferred class is well taken. It is sug-

gested, however, that these questions were put to the claimant by collusion between him and the counsel for Dunbar, for the purpose of enabling him to give evidence in his own favor. By referring to the decree in this case, it will be seen that the complainants, or any creditor who had established his claim before the master and who had consented to be examined on oath as to his own claims, was to be at liberty to contest before the master the validity and amount of claims presented by others; and that the powers given to a master by the rules of this court, relative to the examination of creditors coming in to claim under a decree, were extended to this case. The first part of this provision which relates only to the validity and amount of the claim, would not perhaps be sufficient to authorize a creditor to examine a claimant on oath as to the class within which his debt was to be placed. But the latter part, which refers to the rules of the court, is sufficient to authorize the master in his discretion to compel the claimant to answer an interrogatory to show that he was not entitled to be placed in the class of preferred creditors. Such an interrogatory, however, could not be put without the consent of the master, or for the mere purpose of enabling the claimant to make out his claim to priority; as that would be a fraud upon the rights of other creditors. But there is nothing in this case to show that the interrogatories were put to this claimant without the consent of the master; for if they were he should not have taken down and reported the unauthorized answers as a part of the examination of the claimant. In cases of that kind, if any party is dissatisfied with the decision of the master in allowing or disallowing an interrogatory to the claimant, he must put it in a shape to enable the court to review the master's decision; and if the master decides that the interrogatory is improper he should not allow it to be put or answered. For the purpose of disposing of the question now before me, I must presume the question was put in good faith, and by the consent of the master, for the purpose of showing that the consideration of these notes was illegal, or was not of a character to entitle them to be placed in the list of preferred debts. The answer, respon-

1839.

Pratt
v.
Adams.

sive to the interrogatories, is therefore conclusive evidence of the fact that these five notes were given for money lent, even if the other evidence was not sufficient for that purpose. The exception must be allowed, with costs to the exceptant to be paid out of the fund in the hands of the trustees.

J. J. Baldwin presented and proved two checks drawn by Rathbun on the Bank of Buffalo, the one dated the 3d and the other the 15th July, 1836, and payable on the corresponding days of the next month, amounting together to the sum of $1600. These checks were given upon a sale of uncurrent bills to Rathbun by Williams & Baldwin, who were brokers in Buffalo; which bills were about three per cent below par with the brokers in Buffalo, but were taken at the banks in that place at from one to two per cent discount in payment of debts; and were also received at par in the city for labor and in the way of trade. The claimant insisted upon the validity of the drafts and claimed to have them placed in the class of preferred debts on the ground that they were debts due to persons residing in Buffalo at the time of the assignment, for money lent. The master, however, rejected the claim entirely, on the ground of usury. And to this decision the claimant excepts. There is no pretence in this case that Rathbun took these uncurrent bills because he preferred them to the funds of the bank, upon which he gave his check. And if the transaction is to be considered as a loan of money to be paid in current funds, or specie, at the bank at the end of the month, then the master was right in considering the contract as usurious and void, upon the authority of the case of *Gaither* v. *Farmers' Bank of Georgetown*, before referred to. In the case of *Stuart* v. *The Mechanics' and Farmers' Bank*, to which the counsel referred on the argument, (19 *John. Rep.* 511,) the chief justice, who delivered the opinion of the court, says there was no evidence that the notes of the Niagara Bank were under par at Albany where the loan was made, or that the lenders had any reason to believe that the bank was not perfectly solvent. Besides, it was shown in that case that Niagara bills were in the hands

of the lenders under such circumstances that they could not make any thing more than legal interest either directly or indirectly by lending those bills instead of their own. The bills were deposited with them as collateral and further security for the payment of a debt, with authority to loan or sell them and credit their full nominal value towards that debt which was then considered perfectly secure. It was in consequence of these peculiar features in that case that the court of dernier resort considered the case as free from usury. And it is very evident the decision must have been otherwise if it had been a mere loan of depreciated paper as a loan of money and not a sale of a commodity, to be repaid with seven per cent interest on the nominal amount. The case of *The Bank of the United States* v. *Waggoner*, (9 *Peters' Rep.* 378,) is of a similar nature, and the contract was sustained upon the like peculiar state of facts; but principally upon the ground that it was not a loan of money, but the sale of depreciated bills, or an exchange of securities, for the mere accommodation of Owens, and without any intention of getting more than legal interest by the transaction. Upon the authority of this last case, perhaps the master might have been justified in concluding that Williams & Baldwin did not intend to make an usurious loan of money to Rathbun, but to sell him the uncurrent bills as a matter of exchange or merchandize merely; and without any intention of evading the statute of usury. If so, the claim should not have been rejected entirely. But in that case it must necessarily be excluded from the class of preferred debts as not being for money loaned. For if it was intended between the parties as a loan of money to be paid in these depreciated bills, which were not equal to money at that place, it was unquestionably usurious. If the claimant wishes it, the exceptions may be so far allowed as to place these debts in schedule Q. and without costs to either party. The claim to have them placed in the class of preferred debts must be rejected.

The exceptions of White, and of O. Allen, depended upon the same principle in every respect, and therefore must be disposed of in the same manner.

The $3000 note of J. Miller, referred to in his first exception, depends upon the same principle, so far as the question of usury is concerned; or rather, the evidence is not sufficiently explicit as to the precise terms of the bargain to enable me to form any opinion whether it was actually a loan of money which would be void for usury, or a mere sale of depreciated bills which might, under certain circumstances, be considered as a mere sale of a commodity instead of an usurious loan of money. For these reasons the claimant is entitled to have that debt allowed as a valid debt against Rathbun. But in addition to the reasons for excluding this, in common with the three last claims, from the class of preferred debts, there are other reasons why this claim cannot be placed in that class. Even if Miller resides in the city of Buffalo, of which there is no evidence here, this note was purchased by him long after the assignment; but from whence he received it does not appear. The note was made payable to Lyman Rathbun, and appears to have been endorsed first by him, and Townsend & Coit, in which situation it was, I presume, when it was received by Sherwood in payment of his uncurrent bills. It appears afterwards to have been endorsed by Sherwood, and then by John Baker, Jun. who, from some other papers in this cause, I suppose was not a resident of Buffalo, but of the city of New-York. The preference is given " to any and all persons residing in the city of Buffalo, such amounts as I owe them for money lent to me." To entitle a debt to a preference, therefore, it must be a debt which Rathbun at the time of the assignment owed to a person then residing in the city of Buffalo. It appears by schedule B., that Sherwood lived in Buffalo at the time of the assignment, which I will presume to be the city, although this description would be correct if he resided in the town of that name, which it is said extends beyond the bounds of the city. It does not appear, however, that he was the owner of this note at the time of the assignment, so as to bring it within this clause of schedule B. From the fact of his having endorsed the note over to somebody else, who has subsequently endorsed it to Miller, the reasonable

presumption is, that it was in the hands of Baker at the time of the assignment. The first exception is therefore allowed, so far only as to reverse the decision of the master rejecting the claim entirely; but not to place it in the class of preferred debts.

The second exception relates to a note made by Rathbun for $2297, payable to the order of Lyman Rathbun, at the Merchants' Bank of New-York. It also purports to have been originally endorsed by O. Allen, M. B. Sherwood, and John Baker, Jun., whose signatures, however, have all been erased. But whether the endorsements of any of the persons whose names were on the note, subsequent to L. Rathbun's, were genuine or forgeries does not appear by the proof before the master. Neither does it appear that the claimant received this note from any person residing in Buffalo. As there was nothing to show that the note was given for money lent, or was owing to any person living in Buffalo at the time of the assignment, or that it was endorsed by Sherwood for the accommodation or benefit of Rathbun, so as to bring it under the other clause of preference, the master was clearly right in refusing to place it in the class of preferred creditors. The second exception must, therefore, be disallowed, and neither party is to have costs on the exceptions.

The exception of Janes relates to the acceptances which are in the hands of Pratt and of R. L. Allen. But as the whole question has been examined and disposed of on the exceptions of Pratt and Allen, the allowance of this exception would be improper and useless. It is therefore overruled, but without costs.

The first exception of M. B. Sherwood relates to the disallowance of a draft drawn by him on the 16th of July, 1836, on J. Baker of New-York in favor of J. R. Lee, cashier. I think the master was right in disallowing this claim, as there was no sufficient evidence that it was drawn for the benefit and accommodation of Rathbun, and was still due to Sherwood. If it is the draft which the clerk of Sherwood has "a kind of recollection of seeing," then security was given for it at the time; and that security should have

been produced before the master to show that Sherwood had not already been paid. Lee was the person in whose favor this draft was drawn ; and if he knew any thing about its being drawn for the accommodation of Rathbun and not secured by him at the time, he should have been produced as a witness, if alive ; instead of giving the vague impressions of the clerk, derived from some conversation with him. This exception must therefore be disallowed. The second exception relates to two notes taken in payment for uncurrent money, which was three per cent below par. And as it is a case upon all fours with those of Baldwin, and of White, and of O. Allen, the exception must be disposed of in the same manner.

The third exception of Sherwood is that the master has not placed the debt of the Paterson Bank in the class of preferred debts, nor permitted him to prove that debt in his own name upon his counter securities for his indemnity as the accommodation drawer of the draft held by the bank for the benefit and accommodation of Rathbun. The facts in relation to this claim are as follows, as appears by the proof before the master : In June, 1836, Sherwood drew five drafts of $2000 each upon his correspondent in New-York, payable to the order of and for the accommodation of Rathbun sixty-seven days after date. And to put his correspondent in funds to meet these drafts when they became due, or as counter securities against Sherwood's liability as such accommodation drawer, Rathbun gave to him five notes of the same amounts, payable a few days before the drafts would fall due. The notes were sent to Sherwood's correspondent in New-York for collection, but were protested for non-payment. Under such circumstances it is evident, from the terms of the assignment, that Sherwood is entitled to have this debt placed in the class of preferred debts, either in his own name, or in the name of the Paterson Bank, for his protection and indemnity. An exception was taken in the name of the Paterson Bank, but which was abandoned by his counsel, and overruled by the court, on the ground that he was not authorized to except in the name of that corporation without its consent. It is said

there is no proof that Sherwood was duly charged by protest and notice as the drawer of these drafts. That, however, appears to be immaterial, as the acceptor is undoubtedly liable for the payment of the drafts. If Sherwood drew on funds in his hands, the acceptor may retain such funds to meet his acceptances; which will be in substance a payment of the drafts for Rathbun, by Sherwood, through his correspondent. And if he drew without having funds there in anticipation of the payment of these counter securities given by Rathbun, he must still indemnify his correspondent against these acceptances. If he is not directly liable to the Paterson Bank, therefore, upon the drafts themselves, for want of regular notice of their dishonor by the acceptor, he is indirectly liable through such acceptor, who is liable to the bank on his acceptances. Under the English bankrupt act, prior to Sir Samuel Romilly's act, (49 *Geo. 3d, ch.* 121,) an accommodation drawer, or endorser, or acceptor who held such a counter security, was permitted to prove the debt in his own name, for his indemnity. (*Henley's Bankr. Law*, 150.) In this case, however, I do not think it was absolutely necessary that he should have proved the counter securities as a distinct debt in his own name, as the bank which held the drafts had proved their debt. But if they had refused to prove, then it would have been the duty of the master to have allowed Sherwood to amend his claim so as to meet that state of facts. As that claim was proved, Sherwood, who was directly interested in the question, had a right to insist before the master that the debt should be placed in the preferred class for his benefit. And as the master did not so place it, I think Sherwood had such an interest in the question as to authorize him to except in his own name. The third exception must, therefore, be allowed, and this debt must be changed from the second to the preferred class, for his benefit and indemnity, upon his delivering up to the assignees the five notes which he held as counter securities. The last exception is not sustained by the proof before the master, as there was no offer to prove the other drafts alluded to in this exception which the master rejected. If the exception refers to the refusal of the

1839.

Pratt
v.
Adams.

master to amend the claim, the party has mistaken his remedy. The application to amend in that stage of the proceedings was a matter of discretion with the master, and not a matter of strict right. If the claimant, therefore, was not satisfied with the master's decision, he should have made a special application directly to the court for instructions to the master on the subject; instead of delaying the cause until the master's report was completed, and then attempting to review the decision of such a question by an exception. The fourth exception is, therefore, overruled; and neither party is to have costs upon the exceptions of this claimant.

By the direction which has been given in relation to costs upon several of the exceptions which have been allowed, wholly or in part, it is not intended to preclude the solicitor for the complainants, whose duty it was, as faithful trustees, to protect the rights of absentees and others who were not in a situation to judge of or protect their own rights, from recovering or being allowed such costs as they may be entitled to on those exceptions, to be paid out of the fund in their hands.

---

A petition was presented on the part of the State Bank at Elizabeth, in New-Jersey, for leave to go before the master a second time, and make further proof for the purpose of having the claim of the bank placed in the list of preferred creditors under the assignment, made by B. Rathbun, giving a preference in payment to H. Janes, for endorsements and acceptances made by him.

August 6.

THE CHANCELLOR. If the only difficulty in relation to this claim was the want of formal proof of the notice of the dishonor of the notes, so as to charge Janes as endorser, or was the mere neglect of the agent of the bank to employ counsel, to make a formal objection before the master to the draft of the report, and to file exceptions to the report itself after it was completed, I should be inclined to let the petitioners in, to produce proof of the notice of protest, and to

except to the report. For it now appears, that certificates of the protest of the notes were produced before the master; and it is not pretended on the part of those who oppose this application, that any objection was made to that kind of evidence, so as to call the attention of the claimant to the fact that the protest was not technical legal proof to show that Janes had been duly charged as the endorser of the notes which had been discounted at the bank of the petitioners.

Upon an examination of the proof which was produced before the master, however, I am satisfied that Janes never was legally liable for the payment of these notes, as endorser. No formal evidence, therefore, showing that he had due notice of the dishonor of the notes, could have enabled the petitioners, successfully, to except to the master's report. It appears by the testimony of Janes, with whom the agreement for the loan was finally concluded, that it was a condition of the loan that the small bills of the bank should be taken, upon the discount of the notes, and should be circulated at Buffalo; and that the money was to be advanced as fast as such small bills were filled up. The money, received upon the discount of the six notes endorsed by Janes, was also brought to him in the city of New-York, by the cashier of the bank, in bills mostly of the denominations of ones, twos, threes and fives. And although Crane says that the *bank* did not make it a *condition* of the loan that small bills should be taken in payment, yet it is perfectly evident, from the whole testimony, that it was well understood by the officers of that institution, by whom the arrangement with Janes was made in the city of New-York, that a part at least of the loan should be received in bills of a less denomination than five dollars; which bills were to be circulated in this state, in violation of our laws in relation to foreign bills of that description. *Laws of* 1830, *p.* 357, *and of* 1837, *p.* 37.)

It is a well settled principle of the common law, that no court of justice will lend its aid to enforce the performance of any contract, or agreement, which was intended, by the parties thereto, to contravene the provisions of a positive law,

or the performance of a contract which is contrary to public policy. And the case of *De Groot* v. *Van Duzer*, before the court for the correction of errors, in December last, was decided upon the principle that where the intention of one of the parties to a contract is to enable the other party to violate a law of the state, the contract is void; and that no action can be sustained, by either party, founded upon such a contract. (*See also Waite* v. *Jones*, 1 *Hodge's Rep.* 166; *Pellecoat* v. *Angel*, 1 *Gale's Rep.* 187; *and Gould* v. *Williams*, 1 *Harr. & Woll. Rep.* 344.) The State Bank at Elizabeth, therefore, could not have sustained any suit, either at law or in equity, against Janes, as the endorser of these notes, or against Rathbun the drawer. And Janes not being liable as endorser, and never having in fact paid the notes, the petitioners were not entitled to be placed in the list of preferred creditors under the assignment. If the master erred, therefore, in this case, considering the notice of protest to be duly proved, he erred in not rejecting the claim entirely, as illegal and void.

The petition must be dismissed; with $10 costs to the complainants, and $5 costs to each of the solicitors who appeared in behalf of creditors of the preferred class, to oppose this application.

———

A similar petition was presented, in behalf of B. B. Bend; who also asked for leave to except to the master's report, upon the testimony as already given, if the court should be of opinion that he was not entitled to give further evidence to bring his claim within the class of preferred creditors.

August 6.          THE CHANCELLOR. This is a second application to permit the petitioner to come in and make further proof of his claim before the master, or at least to permit him to except to the master's report, placing the claim in the second class. So far as relates to the further proof, I see nothing to change the opinion I formerly expressed, that there was no ground for admitting further proof; as the person who pro-

fessed to act as counsel for the petitioner before the master declined to have Janes examined. This petition, however, shows a state of facts, proved before the master, which perhaps may be sufficient to sustain the petitioner's claim, to be placed in the list of preferred creditors, upon the same principles upon which I have allowed the exceptions of some of the other claimants. And as these facts did not appear in the former petition, and there has unquestionably been some misunderstanding of the petitioner in relation to the mode of presenting his claim, I think I should be doing him injustice if I did not permit a re-hearing of his motion, on these new facts; so far as relates to the right to except to the report, upon the ground that his claim was not placed in the first class. The petitioner must therefore be permitted to except to the master's report, on that ground, provided he files and serves his exceptions, and brings the same on to be argued, upon due notice, on or before Friday of the first week in the next stated term of this court. And he must pay to each of the solicitors who have appeared to oppose this application and who represent clients whose claims are placed in the first class, they alone having any real interest in the question, $5 costs for opposing this application, and to the solicitor for the complainants his costs, to be taxed. The petitioner must, also at his own expense, furnish the necessary papers for the court upon the hearing of the exceptions.

---

A petition was also presented on the part of the Erie Bank, in the county of Erie, for leave to go before the master and prove the fact that the drafts, holden by the bank, were accepted by Janes for the accommodation of B. Rathbun; and to have the claim placed in the class of preferred debts.

THE CHANCELLOR. It is very evident that the claim, August 6. upon the facts sworn to in the affidavits and the petition, belongs to the first class; and that the neglect of the solicitor, to prove the fact that Janes accepted the drafts for the

accommodation of Rathbun, was owing to some misunderstanding, on his part, of what was said by the master in relation to some other claim. The neglect to attend before the master, upon settling the drafts of his report, is sufficiently accounted for; although, as it now turns out, an objection to the report, based upon the evidence which was in fact adduced before the master in relation to this claim, would not have changed the result before him. There certainly has been a great want of vigilance on the part of the solicitor, in relying upon somebody else to examine Janes as a witness, generally, as well for the benefit of his clients as of others who had conflicting interests; especially, if he had been previously informed of the decision of the master, that each creditor was to take the proof as to his own claim separately. But it would be adopting too hard a rule, if the court should compel the client to submit to the loss in every case where his solicitor made a mistake, or even in all cases of gross negligence or ignorance. A discretion, therefore, must be exercised by the court in such cases, for the furtherance of justice. And in the exercise of that discretion, I shall permit the petitioners to be placed in the class of preferred creditors, upon the coming in of the special report of the master, under the order which has already been granted de bene esse, if the facts as reported by him are sufficient to show that this claim belongs to that class. But the petitioners must pay to the parties who have appeared to oppose this application, and whose claims belong to the preferred class, and also to the complainants' solicitor, their respective taxable costs of opposing the application; including their costs of attending before the master a second time to resist such proof. Upon the master's special report being completed and filed, therefore, the petitioners are to be at liberty to apply, at any regular motion-day thereafter, or in term, upon due notice to the complainants' solicitor, and to the solicitors of such of the preferred creditors as have appeared in the cause, for such order and direction upon such special report as shall be proper; in relation to the class in which their claim shall be placed. And if the facts appear as they are stated in this petition and the affidavits in support

of this application, their debt will, as a matter of course, be placed in the first class, unless there is unnecessary delay in obtaining and filing the report.

————

An application was afterwards made in behalf of Shipman, Corning & Co., to have their claim upon two notes specified in the assignment, which notes had been rejected by the master as usurious, allowed and placed in the schedule of preferred debts. The cause also came on to be heard upon the exceptions of B. B. Bend to the master's report; and also upon the exceptions of the Bank of Utica to the master's general report, and upon his special report in relation to the claim of the bank to be placed in the class of preferred creditors. The following opinion was thereupon delivered in relation to those several claims.

THE CHANCELLOR. The claim of Shipman, Corning & Co. to be placed in the schedule of preferred creditors, for the amount actually loaned upon the notes specified in the assignment to the trustees, after deducting so much of that amount as was subsequently referred to the claimants by the agent who negotiated the loan, is undoubtedly well founded. It depends upon precisely the same principles on which a similar claim has already been allowed in the case of John Ward & Co. And if an exception to the report had been filed in time, it would of course have been allowed. The excuse, for not bringing in objections before the master, and for not excepting to the report before it became absolute, and for the delay in making the present application until the decision on the exceptions of John Ward & Co. had been made, is entirely satisfactory to the court. No injury has been sustained by any other creditor or party to the suit in consequence of the delay. And the mere formality of filing and arguing an exception to the report, after the question has been fully argued and decided upon a like exception, upon another claim which was similar to this in all respects, would be a useless waste of time, both for the counsel and the court. I shall

therefore allow the claim of the petitioners; and direct their to debt be placed in the class of preferred debts, to the extent of the balance now remaining due to the claimants.

The defendant B. B. Bend presented and proved two drafts in his favor, for about the sum of $5000, drawn by B. Rathbun, upon H. Janes, and accepted by him in June, 1836. The amount of these two drafts was allowed by the master as debts justly due by the claimant from B. Rathbun; but he refused to place them in the schedules of preferred debts, for the same reasons which had induced him to exclude other debts for which Janes was liable, as acceptor or endorser, but which he had not actually paid. It having been already decided that the master erred in disallowing such claims, upon those grounds, the only question in relation to these drafts is whether the testimony is sufficient to establish the fact, that the drafts were accepted by Janes for the accommodation of B. Rathbun. Independent of the fact stated in the master's report, that the claims referred to in schedule P., from 400 to 410 inclusive, were proved by Janes to have been accepted for the benefit and accommodation of B. Rathbun, I think there was sufficient evidence to satisfy the master that these drafts were thus accepted. Bend himself was called and examined, either by the complainants or by some of the other creditors, as a witness in opposition to his claim on these drafts. His testimony therefore is evidence in his own favor; as it was in answer to interrogatories which his adversaries had a right to put to him, and which he was bound to answer on oath. From his examination, in connection with the evidence of the claimant's clerks, it appears that the drafts were given for the purchase money upon a sale of goods to B. Rathbun, which goods were, by the terms of the sale, to be paid for by the drafts of the purchaser, upon Janes, who was his agent in New-York, endorsed by some responsible person at Buffalo. It is evident, therefore, from the whole transaction, that the understanding of both parties was, that the purchaser of the goods was the principal debtor, and that the acceptor, as well as the endorser of the drafts, was a mere surety for the debts. The exception of

Bend to the master's general report must therefore be allowed; but without costs to either party against the other.

The President, Directors and Company of the Utica Bank presented and proved before the master eight drafts drawn by B. Rathbun upon H. Janes, and accepted by the latter in July, 1836. These drafts were payable to the order of Lyman Rathbun and were endorsed by him; and they were discounted by the bank, in the ordinary course of business, for a person who claimed to be the endorsee and holder thereof. The master allowed the claim, but refused to place it in the schedule of preferred debts. The only evidence, to prove that these drafts were accepted for the accommodation of B. Rathbun, is the testimony of Janes himself, who is objected to as interested in favor of the claimants. I will not say, without further consideration, that the counsel who argued in opposition to this exception are not right, in supposing that Janes is technically interested in establishing the facts necessary to have these drafts placed in the class of preferred debts. But as he has been admitted, without objection as a witness, to prove the same facts in relation to many other claims which have already been placed in the preferred class, I feel it to be my duty to allow the exceptants, in this case, to avail themselves of a technical objection on their part, if any such can be found; to avoid the effect of the mere technicality upon which Janes' testimony is sought to be excluded in relation to this particular claim. And I think there is a technical objection to the form in which the testimony of the witness was sought to be excluded in the present case.

It appears by the master's report, than an order of this court was produced before him, for the examination of Janes as a witness in behalf of the claimants in relation to his claim. I know not how that order was obtained. But as the entering of a common order, to examine a defendant as a witness in behalf of a co-defendant, after a decree in the cause, does not appear to come within the provisions of the 73d rule, which rule was only intended to provide for the examination of a defendant as a witness previous to the hearing, I must presume that the order was regularly obtained,

1839.

Pratt
v.
Adams.

upon a special application to the court. Again; if the witness was incompetent, that objection should have been made before the master who was executing the decretal order of the court, at the time the application was made to him for an order to examine the witness; and not before Master Emmet, who had no authority to decide upon the validity of the objection; or at least, the objection, which was made before Master Emmet, should have been renewed before Master Ford, when the testimony of Janes was read before him to establish the claim of the bank to be placed in the class of preferred creditors. I shall therefore disallow the technical objection to this witness which is now made; and shall receive the evidence of Janes, to establish the fact of his acceptance of the drafts for the accommodation of B. Rathbun, as it has been received for the same purpose in other cases. Upon that evidence, the claim of these exceptants to be placed in the preferred class, rests upon the same ground which was adjudged to be sufficient to sustain it, in the case of the first exception of the Granville Alexandrian Society. The exceptions to the master's general and supplemental reports must therefore be allowed. And the general report must be corrected accordingly, by placing the debts due to the Bank of Utica in the schedule of preferred debts. But no costs are to be allowed to either party as against the other, upon these exceptions, except such costs as were directed to be paid by the special order of the 4th of February, 1839, in relation to this claim.

The Erie Bank of the county of Erie, in Pennsylvania, having procured the special report of the master in relation to the claim of that bank to have its two drafts placed in the class of preferred debts, and the question having been submitted to the court upon that report for its direction and decision in the premises, the chancellor delivered the following opinion and decision in relation to that claim:

1839.

Pratt
v.
Adams.

October 28.

THE CHANCELLOR. This case distinctly presents the question whether Janes, the acceptor of these drafts, and who is legally liable to pay them to the present holders thereof if the same should not be paid out of the assigned property, is a competent witness for such holders, to prove the facts necessary to establish their claim to have the drafts placed in the class of preferred debts. There can be no doubt, under the circumstances of this case, that the witness is interested in the establishment of the fact that these drafts were accepted by him for the accommodation of B. Rathbun if they were in truth so accepted. For if they were accepted for the accommodation of B. Rathbun, and the holders should obtain satisfaction thereof out of the assigned fund, either wholly or in part, Janes will be discharged from his liability to the bank pro tanto ; and will not be bound to pay the same to the assignees of B. Rathbun. But if they were accepted by him upon funds in his hands, belonging to the drawer, and not as an accommodation acceptor, then it cannot legally benefit him to have the present holders of these drafts placed in the class of preferred creditors, and paid out of the fund in the hands of the assignees of B. Rathbun. For whatever amount the bank shall obtain from the assignees of the drawer, these assignees will, as a matter of course, have a right to claim the repayment of a like amount from the witness ; in the same manner as if Janes had been the drawer of a note and the assignees of the endorser had been compelled to pay the amount thereof to the endorsee. And in the form of the proceeding which has been adopted in this cause, a decree between the various creditors of B. Rathbun as to the particular class in which his debt should be placed, cannot operate as an estoppel, between the witness and the assignees ; so as to prevent them from recovering against him on his acceptances, unless he can show that it was true, in point of fact, that the drafts were accepted for B. Rathbun's accommodation, and not for value received by the acceptor from him. It cannot be a valid ground of objection to the testimony of a witness, that he has an interest in establishing the truth, where he can not be in any way benefitted by swearing to what is

untrue. For the legal principle upon which an interested witness is rejected, as incompetent, is, that his interest is of such a nature that he may be tempted to testify to what is not true in fact. Janes, therefore, had not such an interest as to legally disqualify him from giving evidence in favor of the Erie Bank, as the holder of these drafts, upon the question which was in litigation before the master.

Again; if Janes was an incompetent witness for the purpose for which he was called, then the testimony of Rathbun Allen, as the next best evidence which it was in the power of the bank to produce, was, I think, prima facie sufficient to establish the fact that these drafts were accepted by Janes for the accommodation of B. Rathbun. This witness was one of the financial agents of B. Rathbun, and knows that Janes acted as his agent in New-York, to purchase goods for him, and to accept drafts upon which the drawer was raising money, at the different banks in this and other states, to carry on his magnificent speculations. And the witness says the practice was for Janes to accept the drafts and for B. Rathbun to furnish the funds, afterwards, to meet the payments when the drafts became due. The drafts being thus accepted in anticipation of funds to be furnished by the drawer, were accepted for his accommodation, within the meaning of that clause of the assignment under which the preference is claimed. And if funds were afterwards placed in the hands of Janes to meet these drafts when they became due, the proof of that fact rested with those who resisted the claim of preference; as the bank could not be legally required to prove a negative.

The amount of the two drafts of the Erie Bank, which are numbered 552 and 553, in schedule 2, annexed to the master's general report, must, therefore be placed in the class of preferred debts, by the master; in making out the *tableau* of distribution as directed by the decretal order of the 21st of September last. But the assignees are to retain, out of the dividends payable on account of these two drafts, the taxable costs, of the several parties who opposed the application to take further testimony in relation to his claim, as heretofore directed, and pay such costs to the several soli-

citors entitled thereto; provided such costs shall not have been previously paid by the Erie Bank of Pennsylvania, to whom the drafts belong.