The American Life Ins. and Trust Company *vs.* Dobbin and others, ex'rs of James Dobbin, deceased.

By the restraining act, 1 R. S., 600, § 4, corporations not expressly incorporated for banking purposes are prohibited from " discounting bills, notes or other evidences of debt" and from " buying and selling bills of exchange," &c., and by 2 R. S., 457, § 2, this prohibition is extended to foreign corporations. But the above provision of the restraining act, being penal in its nature, must be construed strictly, and as it forbids the buying and selling of *bills of exchange* only, a foreign corporation is not prohibited from purchasing *promissory notes*.

Where the evidence left it uncertain whether a transaction amounted to a purchase or a discount of a note, the judge should not have decided the question as a matter of law, but should have submitted it to the determination of the jury.

Where a promissory note, given in the ordinary course of business and available in the hands of the holder, is transfered by him at a discount exceeding seven per cent, the transaction is not *per se* usurious, although the seller endorses or guaranties the payment of the note. It may be regarded as a bona fide sale, and not a discount, notwithstanding such endorsement or guaranty. *Per* Beardsley, J., citing authorities.

Assumpsit to recover the amount of a promissory note, dated July 27, 1839, signed Evans and Carman, for one thousand dollars, payable to the order of James Dobbin, four months from date with interest, and indorsed by said Dobbin. The general issue was pleaded. The cause was tried in May, 1843, before Kent, Cir. J. The plaintiffs were admitted to be a corporation duly created and organized by and under an act of the legislature of the state of Maryland. It was admitted that James Dobbin died shortly after the date of the note in suit and that the defendants were his executors. The indorsement of said note, demand of payment and notice were also admitted, and the note was read in evidence.

It was admitted by the plaintiffs that previously to the 15th February, 1837, and until and after the 30th November, 1839, the plaintiffs kept an office in Wall street in the city of New York. A book was produced by the plaintiffs and given in evidence by the defendants, called "*Domestic Bills,*" which was marked in columns, appropriately headed, so that the entries therein show the presentment of various notes and bills of exchange to said company, and the transfer thereof to the plaintiffs; which notes and bills were payable elsewhere than in the city of New York. The said entries, in their appropriate columns, state the names of the presentors of such bills and notes; the names of the indorsers, of the payers, the place of payment, time of payment, the period of time to the time of payment, rate of exchange allowed to the company, amount of discount and exchange, total amount of the obligation, amount paid to the presentor and date of the purchase as called in said entries by the plaintiffs. This book was admitted to have been kept at the said office by the plaintiffs, and contained a statement of a part of their proceedings in said office. These entries in said book were from August 1, 1836, to June 26, 1841, and cover twenty-seven pages of said book. Certain entries in said book of the date of 15th February, 1837, state that on that day Evans & Carman presented to said plaintiffs a note payable June 17, 1837, by Holmes & Carroway at Mobile, in Alabama, indorsed by James Dobbin; that the time the said note had to run was 122 days, rate of exchange five per cent; the amount of discount and exchange thereon, $148.55, the total amount of note being $2,015.18, and the net proceeds paid therefor by the plaintiffs to Evans & Carman amounted to $1,866.63. Said book indicated it as a purchase of said note. The defendants then proved that the note last mentioned was dated September 14, 1836, at nine months, payable at Mobile in Alabama; that it was indorsed by said Dobbin; that it had been given by the makers thereof, Holmes & Carroway, to Evans & Carman for goods sold by Evans & Carman. That Evans & Carman applied to the plaintiffs at their said office to obtain the money upon said note, and the plaintiffs agreed with them to take said

note, and let them have the money therefor, on the terms stated in said entries in the aforesaid book, the interest being computed at seven per cent, and exchange as stated at five per cent. And thereupon the plaintiffs, at said office, advanced to Evans & Carman $1,866.63, the amount of said note, less the said interest and exchange, and took said note. Evidence was given to show that the rate of exchange at that time was about one and a half per cent on bills payable at sight, but no question as to usury was decided by the judge. Said note of Holmes & Carroway was not paid, but was returned protested in July, 1837, at which time Evans & Carman paid a part of the amount of it to the plaintiffs and gave to the plaintiffs a new note for the balance, at four months, indorsed by said James Dobbin as accommodation indorser, and thereupon the said note of Holmes & Carroway was given up to said Evans & Carman by the plaintiffs. The aforesaid note so given by Evans & Carman was reduced and renewed from time to time, until the note in suit was given in renewal thereof.

The judge charged, as matter of law, that the plaintiffs in taking the note of Holmes and Carroway, under the circumstances in proof, violated the laws of this state against unauthorized banking, and that therefore they could not recover. To this the counsel for the plaintiffs excepted. There was a verdict for the defendants, and plaintiffs move for a new trial on a bill of exceptions.

*By the Court*, BEARDSLEY, J. The note of Holmes & Carroway indorsed by James Dobbin, the defendants' testator, was given to Evans & Carman for goods sold by them, and in their hands was an ordinary business note which they would have had an undoubted right to collect at maturity. In February, 1837, when this note had about four months to run, Evans & Carman, who then held it, applied to the plaintiffs at their office in the city of New York, to obtain the money upon it, which they thereupon agreed to advance, first deducting from the amount of the note interest for the time it had to run, and exchange at five per cent, the note being payable at Mobile in the state of Alabama. Upon

these terms the note was transfered to the plaintiffs and they advanced to Evans & Carman the amount of the net proceeds over and above interest and exchange, as had been agreed.

It is not shown that Evans & Carman indorsed this note on its transfer, or in any manner guarantied its payment. Nor is it at all clear upon the testimony, as stated in the bill of exceptions, that they were responsible to the plaintiffs for the money so advanced. If the advance was by way of loan, the note being transfered to the plaintiffs as collateral security for its repayment, Evans & Carman were certainly liable; but if the advance was as payment on a bona fide purchase of the note by the plaintiffs it could not be regarded as a loan, and the sellers would incur no obligation to repay the money although the note should turn out to be worthless. This principle is indisputable. (Byles on Bills of Exchange, 90, 1, 2; *Fenn* v. *Harrison*, 3 T. R. 757; *Evans* v. *Whyle*, 5 Bing., 485; *Ex parte Shuttleworth*, 3 Ves., 368; *Tydell* v. *Clark*, 1 Esp., 447; *Freeman* ads. *Brittin*, 2 Harr. R., 209.)

In the plaintiffs' book of " *Domestic Bills*," this transaction is indicated as a *purchase* of the note, but that is not decisive of its true character; it may have been really a transfer of the note to secure a loan, although the parties chose to call it a purchase. This may have been merely colorable, and that it was so is rendered, at least, probable by the fact that Evans & Carman provided for the note when it came back to the plaintiffs protested for non-payment. It does not appear why Evans & Carman assumed this burthen, but they probably did so, although that is not stated in the bill of exceptions, because they had so agreed on receiving the money of the plaintiffs.

Had Evans & Carman endorsed this note when it was tranfered to the plaintiffs, that, although evidence of a discount and loan instead of a bona fide sale of the note, would not have been conclusive on the point. It has been repeatedly adjudged that where business paper available in the hands of the owner, as this note was, is transfered by him at a discount exceeding seven per cent, the transaction is not

*per se* usurious, although the seller indorses or guaranties the payment of the security transfered. It may be regarded as a bona fide sale of the obligation and not as a discount and loan, notwithstanding such indorsement or guaranty. (*Cram* v. *Hendricks*, 7 Wend., 569 ; *Magugen* v. *Mead*, 21 *id.*, 285 ; *Rapyelyea* v. *Anderson*, 4 Hill, 472 ; *Nichols* v. *Pearson*, 7 Peters, 103 ; *French* v. *Grindlo*, 15 Maine, 163 ; *Farmer* v. *Sewall*, 16 *id.*, 456.)

That there is a plain and solid distinction between the purchase at the reduced price and the discount of negotiable paper, is obvious enough. It can only be necessary to advert to the distinction as existing, and not to explain wherein the difference consists. Several of the cases refered to proceed on the distinction, and some things are so plain of themselves as really to be obscured by explanation. Promissory notes and bills of exchange given for value, and therefore available to the holder, are as much the subject of sale and transfer as any other property. They may be purchased at any price without the hazard of usury, as the only question will be, was it a bona fide sale or a loan in disguise. If the former, the usury laws have no bearing upon it ; but if it was a disguised loan and the discount exceeds the legal rate of interest, all the authorities agree that it is usurious. Money thus advanced would be lent, but if paid for a note or bill really purchased, whatever the price may have been, it can not with propriety or truth be characterized as a discount of such note or a loan of money.

The case, however, was not disposed of at the circuit upon any expressed distinction between a discount or a purchase by the plaintiffs of the note of Holmes & Carroway. In general terms the judge held and decided, as matter of law, that the plaintiffs in taking that note, "under the circumstances in proof, violated the laws of this state against unauthorized banking," and that therefore they could not recover on the note in suit.

This opinion of the learned judge necessarily affirms that "the circumstances in proof" were free from all doubt and ambiguity, and so decisive and controling in their nature as to prove beyond all contest that the plaintiffs in receiving

the note violated some of the provisions of the statutes against unauthorized banking. It comes to this at last, for nothing short of evidence thus direct and controling could authorize such a disposition of the case as was made. In the opinion of the judge this may have been a discount of the note by a corporation having no power and being forbidden to make discounts, and on that ground illegal; or the supposed illegality may have consisted in a purchase of the note without legal authority for that purpose. But the particular view entertained is not explained in the bill of exceptions.

On the argument various provisions of the statutes were refered to as bearing upon the case, 1. The *third* section of the restraining act, as it is usually called. This declares that " no incorporated company without being authorized by law, shall employ any part of its effects " for the purpose of " making discounts or issuing notes or other evidences of debt, to be loaned or put in circulation as cash." (1 R. S., 712.) And by the *fifth* section all notes and other securities, " made or given to secure the payment of any money loaned or discounted," contrary to the provisions of said *third* section, " shall be void." 2. The *sixth* section of said act. By this no body corporate, except such " as are expressly authorized by law, shall keep any office for " any such purpose as is prohibited by the *third* section, and the *seventh* imposes a penalty of one thousand dollars for keeping such office. 3. The *fourth* section of the statute relative to the general powers, privileges and liabilities of corporations. This enacts that " no corporation created, or to be created, and not expressly incorporated for banking purposes, shall, by any implication or construction, be deemed to possess the power of discounting bills, notes or other evidences of debt, of receiving deposits, of buying gold and silver, bullion or foreign coins, of buying and selling bills of exchange, or of issuing bills, notes or other evidences of debt, upon loan or for circulation." (1 R. S., 600.)

Some of these provisions are manifestly limited in their application to domestic corporations, that is, to such as are created by or under the authority of this state ; and it might

admit of some doubt how far any of them, standing by themselves, should be extended to such foreign corporations as this state may think proper to tolerate within her limits. But it is unimportant to examine this point, for it is expressly provided (2 R. S., 457, § 2) that, "where by the laws of this state any act is forbidden to be done by any corporation or by any association of individuals without express authority by law ; and such act shall have been done by a foreign corporation, it shall not be authorized to maintain any action founded upon such act, or upon any liability or obligation, express or implied, arising out of, or made, or entered into in consideration of such act." This section, as the revisers of the statutes remark, was designed to guard against violations of the restraining laws by foreign corporations (3 R. S., 754), and its effect is to extend the prohibitory clauses, which have been set forth, to foreign equally with domestic corporations.

The different sections which have been stated are parts of a general system of law adopted by this state, and intended to restrain and suppress unauthorized banking.

By these provisions no corporation, foreign or domestic, except such as are authorized by the law of this state (and none but banking corporations are so authorized), shall " be deemed to possess the power of *discounting* bills, notes or other evidences of debt." Nor the power " of buying and selling bills of exchange." And they are expressly prohibited from employing any part of their effects, for the purpose of " making discounts." Nor shall they keep any office for the prohibited purposes. And all notes or other securities made or given to secure the payment of any money advanced or lent on discount, contrary to these provisions, or upon any liability or obligation, express or implied, arising out of or made or entered into in consideration of such act, are void.

These powers and acts, thus denied and prohibited, are the usual powers and business of banking institutions, and it was intended by these enactments that no corporation, unless expressly authorized for the purpose, should exercise such powers or be a party to any such act.

The invalidity of any and every security or obligation

made or entered into in violation of these provisions is affirmed by the statute, but it is also a well known principle of the common law. The statute has superadded its sanction, but has wrought no change in this respect. The law aims at consistency and purity, and in this particular, at least, is free from reproach. It aids no one to violate its behests, but leaves him as it finds him, remediless, to the consequences of his own folly and turpitude. *Ex turpi causa, non oritur actio*. (*Nellis* v. *Clark*, 20 Wend., 24, affirmed in error, 4 Hill, 424; *Perkins* v. *Savage*, 15 Wend., 412; *DeGroot* v. *Vanduzer*, 20 *id.* 393; *Pratt* v. *Adams*, 7 Paige, 653.)

These plaintiffs are a foreign corporation, and whatever their powers and rights may be in the state of Maryland, where the charter was granted, they are here prohibited from making discounts, buying or selling bills of exchange, and from exercising any of the ordinary powers of banking institutions.

In my opinion the testimony in this case did not justify the conclusion, as matter of law, that the plaintiffs discounted the note of Holmes & Carroway. It may have been a purchase of the note, out and out, and not a discount. There was testimony tending to either conclusion, and the point, if material, was peculiarly proper to be decided by a jury in view of all the attendant circumstances. (*Ketchum* v. *Barber*; 4 Hill, 228; *Rose* v. *Dickson*, 7 Johns., 196; *Lowe* v. *Waller*, Doug. 736; and *Cram* v. *Hendricks* and *Freeman* v. *Brittin*, cited before.)

This corporation was not only prohibited from "making discounts" of bills and notes, but from "buying and selling bills of exchange." This security, however, was a promissory note and not a bill of exchange, and therefore was not within the latter prohibition. The clause is penal in its nature and not to be extended by construction. If the purchase of notes could be supposed to fall within the reason of the prohibition against purchasing bills of exchange, that would not authorize the court to extend the words beyond their appropriate signification. The subject to which the prohibition is sought to be extended must be within the fair import of the terms used, as well as the spirit of the provi-

sion, or it is not reached by the enactment. This is the settled rule in the construction of penal statutes. (Dwarris on Stat., 736, 7; *Jenkinson* v. *Thomas*, 4 T. R., 665; *Ex parte Hill*, 3 C. & P., 225; *Rex* v. *Handy*, 6 T. R., 286; *Fletcher* v. *Lord Sondes*, 3 Bing., 501; *United States* v. *Wiltberger*, 5 Wheat., 95; *Sharp* v. *Speir*, 4 Hill, 76.)

I have not looked into the charter of this corporation to see what powers were originally confered upon it. That point is not presented on the bill of exceptions, and I assume that the corporation, as created, was fully authorized to purchase bills and notes. By our statute it is forbidden to buy bills of exchange, but I find no such prohibition as to promissory notes. If this therefore was a purchase of the note of *Holmes & Carroway*, it violated no law and was in all respects unobjectionable. If the judge, however, regarded it as a discount, and not a purchase of the note, as he probably did, I think he should have submitted it to the determination of the jury, and not have nonsuited the plaintiffs on the ground that it was a mere matter of law.

These views dispose of the point ruled at the circuit. Other questions were discussed on the argument, some of which may be material to a final decision of the cause. But they have not been examined or considered.

New trial ordered.