The Assistant Vice-Chancellor.
The pending suit instituted by the complainant, for the avoidance of all the securities embraced, in what at the hearing, was called the Yates Trust, is no bar to this suit, nor does it necessarily put him to an election as to his remedy in respect of the fifteen bonds issued under that trust, which the defendants hold as a part of the security for their debt. The former suit impeached a large amount of bonds, held by numerous individuals having no joint or common interest in the same; on a single ground, their being issued by a banking association contrary to law. All the bonds were secured by one assignment, to Messrs. Yates and others, in trust; hence all the bond-holders with the trustees, were proper parties to that suit. But if the complainant, after stating the common ground of relief against all the bonds secured by the Yates Trust, had proceeded to charge that the bonds held by De Launay & Co. were usurious, or that those held by some other firm were obtained from the North American Trust and Banking Company by fraud, the charge .would have made his bill multifarious. In fact, there was no statement in that bill, under which he could prove the usury alleged in this suit. If the former bill had been filed against these defendants alone, the complainant would not be permitted by a new bill, to set up a new defence to the bonds. A newly discovered defence might be allowed by way of supplemental bill. But when a party has filed a bill for relief against an obligation, on a ground which requires him to make numerous parties, and he has a distinct *297 ground of relief against one of such parties, which could not be presented in that suit, and which goes to that obligation, and also to other securities, which are not and could not be brought into that suit; he is not precluded from bringing a new suit against such party, in respect to all the securities to which the latter ground applies; although it may turn out that either was sufficient to avoid the particular security to which both grounds were applicable. The court will not permit him to litigate the same point in both suits, and will take care that the defendant be subjected to no undue expense or oppression, nor to have two decre.es against him for the same thing.
Another objection to the suit, which is in its nature preliminary, is that the complainant is not a 11 borrower” within the meaning of the “ Act of 1837, to prevent usury,” so that ¡he ma3r file a bill to be relieved from the alleged usurious contract, Without paying or offering to pay the principal sum loaned. In Livingston v. Harris, (11 Wend. 329.) in the court for the correction of errors, Judge Sutherland, in his opinion for affirmance, and Senator Tracy in his • opinion, (which was the only other that was delivered, and which was for a reversal of the chancellor’s decree.) held, that a surety was a “ borrower” within the statute of usury, as enacted in the revised statutes. In Pearsall v. Kingsland, (3 Edw. Ch. R. 195,) the vice-chancellor decided, that an assignee of the mortgagor, for the benefit of creditors, stands in his place, and may impeach the mortgage for usury. The same was decided by the supreme court in favor of a judgment creditor of the mortgagor, in Dix v. Van Wyck, (2 Hill, 522.)
These two cases, though not directly to the point before me, show the adherence of the court to the earlier decisions extending the privilege of avoiding usurious contracts to privies in estate, as well as to privies in law, and in representation or succession.
The act of 1837, was passed about three years after the decision in Livingston v. Harris, in the court of errors ; and that decision, which was contrary to the opinion previously entertained, that the revised statutes had dispensed with the ne *298 cessity of offering to pay the principal loaned on filing a bill for a discovery of the usury, was the principal cause of the passage of the act.
With the term “ borrower,” already in use in the existing statute of usury, and judicially construed in the leading case on the subject, and with the well settled rule, that privies of all sorts could take advantage of the usury ; it is not to be presumed that the legislature, in 1837, intended to fetter and restrict the class of persons, who might avail themselves of the more liberal provisions against usurers, which they were then enacting.
The statute of 1837, was really designed to be a remedial act; and its construction is to be no more strict, than statutes in general; although to lenders, one class of the persons affected by it, it is penal in its consequences. This view of the act has, with but a single exception, been taken by the courts. Thus it was acted upon by the chancellor, in favor of assignees and creditors of the person who obtained usurious loans, in Pratt v. Adams, (7 Paige, 615.) Again, in Cole v. Savage, (10 Paige, 583,) the chancellor decided that the word u borrower,”' as used in the revised statutes, and in the act of 1837, embraced a subsequent grantee of the premises mortgaged to secure an usurious debt, who took them adverse to the mortgagee. And he held that the sureties, heirs, devisees and personal representatives, of the person to whom the loan was made, are “ borrowers”, within the meaning of the statutes concerning usury.
Subsequently to this decision in May, 1844, the case of The Bank of Utica v. Post, came before the chancellor, in which the purchaser of mortgaged premises, under a judgment against the mortgagor, filed a bill to have the mortgage cancelled on the ground that it was usurious. The chancellor sustained the bill, for the reasons assigned by him in Cole v. Savage. The defendant, Post, appealed to the court of errors, and the decree of the chancellor was reversed by that court on the 27th of December, 1844. The case is not reported, and I have seen no *299 account of the reasons for the decision, but the only point contested was that which I have stated.(a)
To go back a little in the order of time, the supreme court, in July, 1841, decided that the word “plaintiff ” in the second and eighth sections of the act of 1837, was restricted in its meaning to the plaintiff on the record in the suit at law; and that the party owning the usurious security, not the plaintiff on the record, but the real plaintiff in the cause, could not be called as a witness under the second section. (Bank of Salina v. Henry, 1 Hill, 555.) Yet in September, 1843, the court of errors re? versed that judgment, and by a strong vote decided that the word “ plaintiff” in the second and eighth sections of the act of 1837, extends to the party in interest as plaintiff, though he may not be the plaintiff on the record. (Henry v. Bank of Salina, 5 Hill, 523, 547.) On what principle off construction these two decisions of the court of errors are to be reconciled, it is not for me to say, nor is it necessary to ascertain for the disposal of this case.
To the extent of privies in representation and by operation of law, the decision of the chancellor remains unshaken, and must be my guide. The judgment of the court of last resort in Henry v. The Bank of Salina, forbids the extension of the apparent ground of its adjudication in Post v. The Bank of Utica, be* yond the point directly involved. And with the utmost defer? ence to that court, and to its decrees, I humbly submit, that a construction of the act of 1837, which will cut off from the heirs and personal representatives of the person who obtains a loan, the privileges which the act was so careful to provide for such person, is not consistent with good sense, nor with sound legal principles.
In this case, the complainant became by operation of law, a privy to the transactions which he alleges to be usurious, and in my judgment is a “ borrower” within the meaning of the act of 1837.
Proceeding to the principal points in issue between the par? ties, I may at once lay out of view, (so far as they concern the *300 relief sought by the bill,) the two transactions of September 3d and October 28th, 1840. The proof does not connect De Launay <fc Co. with the latter; and whatever may have been the character of the former, it was closed, and the debt discharged; and it is now too late to call it in question.
The first contract which becomes material, therefore, is that of January 6tb, 1841, and the leading point involved is the true nature of the transaction. Was it a sale of bills of exchange, made in the usual course of trade, or was it a loan ?
No one will dispute the right to sell foreign exchange, at any price which the drawer or seller may think proper to ask ; and he may fix that price at ten per cent, premium, or 5 30-100 francs, together with a commission of one or more per cent.; or he may establish his price at a round rate of premium, without a commission. The latter is the usual course, but the adoption of the former mode will occasion no embarrassment, except in ascertaining whether there were nothing more than an actual sale intended.
• But when a needy borrower applies to a merchant who is a banker, as well as a dealer in exchange, for a loan either of cash, or credit, and wanting money and money alone, receives foreign bills at an exorbitant rate, only to sell them on the same day for cash, it is very plain that this is not a sale; it is a loan in disguise. The real difficulty in cases of this character, is to penetrate the mists and unravel the webs of mercantile forms, with which the keen and inventive ingenuity of bankers and brokers, covers and cloaks their transactions, when they intend to evade the operation of the statute against usury.
I was referred to Holford v. Blatchford, (3 N. Y. Legal Observer, 311,(a) which I decided in October, 1844, as being parallel to this case. But I do not deem it applicable. There, the point which is here so essential, was entirely omitted, viz : that the contract was a loan, or a cover for a loan ; and, in the absence of that vital allegation, there was an effort to make out usury, (assuming it to have been a sale,) on two grounds ; first, that the bills of exchange drawn by a merchant here on his own *301 house in London, had no vitality in his hands, and were not the subject of sale, and thus the affair was a mere exchange of credits; and secondly, that there was an usurious forbearance of the price of the bills, by reason of the charge of more than the current rate, and a commission besides.
To return to the contract of the 6th of January, 1841: What was its true nature and character ? The answer, responsive to the bill, denies that any application for a loan of money or of bills, was made to the defendants. The form of the application, therefore, does not aid the complainant’s case.
The answer avers that the brokers of the N. A. Trust and Banking Company, applied to De Launay & Co. for the purchase of bills of exchange on Paris, of the tenor, and apon the terms specified in the contract, dated 6th January, and the bills were sold accordingly. The application, therefore, was for precisely such an agreement as was consummated.
Let us look to that agreement, and the circumstances connected with it, to ascertain the objects of the parties.
The banking company by that note or contract, acknowledged to have received of De Launay & Co. their bills on. Paris at sixty days sight, for francs 131,986 2-100ths, and promised to return to them, within or at the end of fifty-five days, the same amount of francs, in bills at sixty days sight on Paris, satisfactory to them, adding interest at seven per cent, per annum, and one and one-half per cent, commission; having deposited with them as collateral security, thirty-seven bonds of the state of Arkansas for one thousand dollars each ; and the banking company thereby authorized De Launay & Co. to sell the whole, or any part of the bonds, on the maturity of the contract, in case it were not fulfilled ; and the company were to pay forthwith, any deficiency there might be in the bonds paying the face of the note, with interest and commissions.
Without looking beyond the agreement itself, the first impression produced by its perusal, is that the operation was one very much out of the usual course of dealing in foreign exchange. In its proper and legitimate function, (Cambio Real,) exchange is the payment of money in one country, to be repaid the just value in specie in another country, according to a price *302 agreed upon between the exchanger and the deliverer or purchaser. The latter pays the money stipulated, and receives the draft or bill of the exchanger or drawer, on his correspondent in the foreign country. The drawer has funds in the foreign country, or a debt due to him by his correspondent the drawee ; or he has credit there, by means of which the draft is to be paid. The deliverer or remitter’s business is to pay the price in the country where it is drawn ; the drawer is to see to providing for its being honored, in the country where it is payable. The drawer, instead of receiving payment in hand, may give a credit for the price of his draft. But a stipulation that the remitter is himself to furnish to the drawer in the foreign country, the means of paying his bill at maturity, is an anomaly in the sale of exchange. That this was the design of the contract in this instance, is apparent from its careful provision to have the banking company furnish here to De Launay &. Co., satisfactory bills on Paris, in good time, in the ordinary course of transmission, to be in the hands of the Havre house, before any of the bills accepted by that house would mature. In calculating the difference in time, there must be added to the five days, the time likely to be gained by a direct transmission of the bills received in payment, over the circuitous transmission for presentment in the course of trade, of the bills furnished here by De Launay & Co.
The price of the exchange is one of the principal, and to the parties, the most interesting of the stipulations, in a contract for its sale. Yet this note shows on its face, that there was no price fixed or negotiated. For a certain sum of money payable in Paris in bills, the company were to return the same sum of money in like bills, payable at the same place, with interest and commissions added. There was no need of any price. The whole compensation lay in the interest and commissions. So the charge of commission, although as I have already remarked, it may be charged in addition to some fixed rate, as a part of the price on a real sale ; is not a customary charge, and subjects the transaction to the suspicion that the contract does not express its true character.
If an application had been made to Mr. De Launay, on the *303 6th of January, 1841, for bills on Paris, to remit to Lyons, by a merchant in New York, with money in his hand, 1 venture to say there would have been nothing said about commission. Mr, De Launay would have told the merchant, that his price for bills was 5 18-100ths or 5 20-100ths francs, and on receiving that price, he would have drawn the desired amount.
In short, if this had been a regular sale of bills on a credit, the company would have given their note for the price, calculated in dollars at the rate agreed upon, (for instance 5 18-100ths francs to the dollar,) with interest during the term of the credit, with a pledge of the Arkansas stock as security. On the other hand, if it had been an avowed loan, the form actually used in this contract, would have been as appropriate to its completion, as any that could have been devised.
Setting out with this unusual character of the contract itself, I will next state the circumstances which are proved. It is clear that Mr. De Launay, the partner residing here, must have been aware of the embarrassed condition of the Banking Company, His requiring full collateral security, both in September and on this occasion, from a Banking Company conducted on as large a scale as the proof shows that this one was, is of itself strong evidence of such knowledge; and it is made conclusive, by the fact that he knew the Banking Company had in September before, sold in New York the bills which they had obtained from him on a contract precisely similar. I say he knew this, because it is charged in the bill that he was aware of it when the September contract was effected, and his answer denying that charge, does not state when he first became acquainted with the fact. From this omission, from his being a dealer in bills, keeping advised of the market for them here, his correspondence with the Havre house, and the deduction of the broker’s commission for selling the bills, from the 2J commission he then required ; it is not to be doubted, that he knew before January, that the bills he issued to this company in September, were sold here. Indeed, his house is not shown to have been so very large bill drawers as to rebut the probability that the throwing of 125,000 francs of his own bills upon the market here, at one time, would have speedily come to his notice.
*304 Another novel feature in this case, regarded as a sale, is that Mr. De Launay directed his house in Havre to accept the bills to the debit of the Banking Company. Why the Havre house should keep any account whatever with the Banking Company, if this were a sale and not a loan, is not readily perceived. If the sale were on a credit, it would be a matter of account purely with the New York house. The Havre house would not enter the Banking Company on its books; it would debit the bills to the New York house, and credit whatever was remitted from that house.
A still more remarkable circumstance, and one in perfect harmony with the inference derived from the written contract, is the expectation or assurance avowed in Mr. De L.’s letter of advice to the Havre house, that the Banking Company would “ cover ” them in season, with a commission of 1-J per cent. Not that the company would secure them for the price of bills sold. That was provided for by the Arkanas bonds; and the same letter advises the Havre house fully on that point. But by covering in season, was plainly meant that the Banking Company were to put the Havre house in funds, to pay the bills which Mr. De Launay had drawn. And as those funds were to be furnished in bills having sixty days to run, the language of the letter shows that Mr. De Launay expected those bills could be turned into cash in Havre or Paris as soon as they were received, so that he did not contemplate any appropriation or withdrawal of the drawer’s funds abroad. In the letter enclosing the remitted drafts furnished in March, he directs them to be credited to the Banking Company, “to cover our drafts on.you on their account and after specifying the amount of the latter, and the interest and commissions, he directs the Havre house to balance the account. Thus not only the drafts sold in New York, but the interest and commission were made matters of account with the acceptors of the drafts in Havre.
A most extraordinary sale of exchange is this, in which the buyer neither pays, nor agrees to pay, money in the country where it is sold, but does agree to replace it in kind in the place where it is payable, and in lime to meet it there—and the accounts of which are kept in the foreign country.
*305 The subsequent transactions reflect much light upon the real views and intentions of the parties in this affair of the 6th of January. Mr. De Launay in his answer, insists that each one was of the same character as that under consideration ; the application was the same, and the contract the same in substance.
They are spoken of by Mr. Be Launay in his letters as credits to the Banking Company to be covered by them, and as a credit on the same stocks as before, and finally he calls one of them a loan.
The currency in which the bills were payable is not important, nor is the place where payable, so long as both sets of bills were to be paid in the same place, and the return bills were to be satisfactory ; that is, as good as the defendants. In each case, the bills represented so much money, expressed in francs, the currency of France, instead of our national currency, dollars. Now suppose that instead of these bills on Paris, the Company’s note had acknowledged the receipt of six promissory notes of Aug. Dapier, payable in Paris, at three months, for 125,000 francs, and had promised to pay the same amount in 55 days in notes payable at Paris, satisfactory to the defendants, and having three months to run. Would it not be just as much a sale of the notes of Dapier, as this is of the bills of De Launay & Co. ? The fluctuation of exchange is no argument to the contrary, because the amount is to be paid in francs in Paris, which are of a fixed standard value. So if the contract had been to receive the notes of De Rham & Moore, indorsed by De Launay & Co., payable in dollars in New York, and to be replaced in like satisfactory notes, with the interest and commission added ; it might with as much propriety be called a sale of De Rham & Moore’s notes, as to say that the transaction in question was a sale of bills of exchange.
I cannot resist the conclusion that the contract of the 6th of January, was a loan of the credit of De Launay & Co., through the medium of their bills of exchange, to the North American Trust and Banking Company. The company entered into it to raise money. Mr. De Launay, I think, was aware that such *306 was their object in obtaining the bills. It does not appear that he had money to loan. He had credit, and they applied for such credit, and the contract was framed to accomplish the objects of both, in the form of a sale of bills of exchange.
The resort to the form of bills of exchange, when something else was intended, is an old device, although new varieties of it are frequently developed; and doubtless more novelties of the kind wall be invented, as those in use are from time to time exploded. More than three hundred years ago, acts of parliament were passed in England, to prohibit the raising of money by the necessitous, in the usurious modes then resorted to, by what was called dry exchange, and fictitious exchange.
As a loan of credit, there is no doubt, in my opinion, that the contract of the 6th of January, 1841, is usurious. There was much ingenious and plausible reasoning about the hazards encountered by De Launay & Co., and the interest and commissions to which they were entitled on their actual and possible advances, and their liabilities on the return bills. As to the latter, the form of return bills on Paris, instead of the payment in New York, at the maturity of the contract, of the francs loaned, computing their value in dollars, at the rate of exchange at the date of the loan, was probably adopted by Mr. De Launay to avoid the risk of any loss by the intermediate fluctuation in the price of exchange. If he received francs in Paris for francs paid there, it was precisely the same as if he received dollars here for dollars loaned fifty-five days before; so that this very stipulation removed one of the hazards which was urged at the hearing. As to the liability on the return bills, it was optional entirely; because the bills if satisfactory to Mr. De Launay, would be good in Paris, without the name of his house. And in each case, it seems the liability of the banking company, preceded that of De Launay & Co., on the return bills.
The defendants counsel submitted a statement, by which, computing interest on the respective loans of credit, on their advance, and their guaranty or indorsement on the return bills, it is shown that the banking company paid for both interest and commissions, much less than the defendants were entitled to. In order to make this mode a fair test, the defendants should *307 debit themselves with the same interest on the credit furnished to them by the company in the return bills, and on the company’s credit, furnished by way of indorsement on the same bills. The effect of this would be to bring the question back to the interest and commission actually charged by De Launay & Co.
Stripped of all its machinery, and brought to a practical test by its operation, the contract may be thus stated: It was a contract of loan, by which De Launay & Co., on the 6th of January, agreed, and by their bills then issued, became liable, to advance F. 131,986 2-100 in Paris, at the end of sixty days after presentment of those bills in Havre ; and they were to receive payment in as good bills on Paris, to be delivered to them here on the 2d of March, payable sixty days after presentment in Paris. They were to receive interest on the whole sum for fifty-five days, and a commission of one and a half per cent. Allowing that an actual advance to take up their own bills, and not a discount of the return bills, was intended; and reckoning the usual periods for presentment of both sets of bills, De Launay & Co., would advance the sum specified in their bills, about forty-five days before they would be in the receipt of the amount of the return bills remitted. For this loan of forty-five days, they were to receive interest at seven per cent, for fifty-five days, and one and a half per cent on the whole sum besides, under the name of commission. Both items, estimated as interest for the use of the money, during the forty-five days, make the rate of interest more than twenty per cent per annum; or if it be computed on the credit for fifty-five days, instead of the cash advance, the rate of interest is about seventeen per cent.
In ascertaining the result, no interest should be cast upon either set of drafts during the time (the sixty days) they were to ran ; for in that respect, one set would balance the other. The idea that De Launay & Co. might be compelled to keep funds ready for an indefinite period, to meet their own bills, is illusory. They bore no interest, so that the holders would of course collect them as soon as possible; and the greater the delay in their transmission, the shorter would be the period between the advance made by De Launay & Co. and their reimbursement by *308 the return bills, assuming that an advance was expected to be made; and instead of providing funds in advance, on an uncertainty as to the time when they would be required, the house in Havre were certain to know sixty days in advance, the precise time when the money would be required to meet each bill which they accepted.
The charge for commission was justified on the score of a banker’s charge in Paris, and the stamps'and postages payable between Havre and Paris, and other petty expenses. All of these would not account for a third of the charge. But in truth, there is no foundation even for these. Mr. De Launay’s letters, and his entries in his books, show that he entertained no such idea of the office of this commission. And in the regular course of trade, all these charges are borne by the drawers of bills, and are covered in the price for which they sell their exchange. A merchant buying a bill on Paris, in the usual course, would be astonished, if besides the current rate of F. 5 26-100, he were required to pay for postages, French stamps, and one-eighth of one per cent, for the Paris banker’s commission.
The hazards of the transaction, do not afford a pretext for the commission ; for they are no other or greater than are incident to loans of money.
And the actual result of the operation tó the borrower, whe ther, as generally happens, it prove to be disastrous, and in time, ruinous ; or whether through chance, or an advantageous use of the money, it results in a benefit to him ; is not a criterion for determining the question of usury. If the lender is, at all events, to receive more than the lawful interest, the contract is usurious.
It was argued, that this contract differs essentially from the ordinary case of an accommodation note, which the payee procures to be discounted at usury, because there the borrower is the party who is to pay the note, and not its maker ; but here there was a real transaction, the bills of De Launay <fc Co. were to go into actual circulation, and to be paid by them in Paris at maturity.
This difference is only nominal. De Launay & Co. were to be « covered” by return bills of satisfactory character, and if *309 those were retained by them until paid, the result would be an advance of money on the faith of those bills, for a short time. Whereas, the real intention was, to make no advance in the affair, relying on having the covering bills cashed in season.
The illustrations from loans or sales of cotton, sugar, and other merchandise, to be returned in kind, with compensation, are not pertinent, because all merchandise fluctuates in value. This distinction is the ground of the decisions in the supreme court, in Holmes v. Wetmore, 5 Cowen, 149, note; Spencer v. Tilden, 5 ibid. 144; and Cummings v. Williams, 4 Wend. 679. Here the thing to be returned, was equivalent to the thing loaned. Both were money, in Paris, which does not fluctuate in value, in the sense in which we say that of goods and articles of sale. The loan was to be returned in genere, in francs, which at Paris are of fixed value, and are the standard and measure of all values in commerce. As all the bills were to be payable there in francs, and the return bills were to he as good as De Launay <fc Co.’s., each set represented so much money at Paris, and they are to be treated accordingly, in the estimates of the credit loaned.
The argument that De Launay & Co. are to be allowed for expenses, trouble and other outgoings in the premises, cannot he sustained. On a loan, all these things are remunerated by the interest reserved. If an additional compensation be taken on that pretence, it renders the contract usurious. The trouble of acquiring or providing the money, is not to be added to the interest at 7 per cent. (Hance v. Williams, 7 Paige, 581; Jacks v. Nichols, Feb. 25, 1846. Assist. Vice Ch.;)(a) and the custom of bill-sellers is not to be received to support such an exaction. (Pratt v. Adams, 7 Paige, 637.)
1 was referred to Ketchum v. Barber, 4 Hill, 224, and Suydam v. Westfall, 4 ibid. 212, and the kindred cases, as sanctioning this charge of a commission. In Ketchum v. Barber, the court placed it on the ground, that there was no loan ; and in Suydam v. Westfall, because none was contemplated, the bills being accepted in a regular mercantile transaction, and to *310 be paid out of the proceeds of produce which the drawer was to remit to the acceptor. In all these cases, the courts merely held that the contracts were not usurious, per se ; but they conceded that it was a question for a jury, whether the commission or other charge in addition to interest, was for trouble and expense incurred in good faith, or was usury in disguise.
My views on the subject of loans of credit were so fully expressed, on deciding the case of The New York Dry Dock Company, v. The American Life Insurance and Trust Company, (Feb. 6th, 1846,)(a) that I need not enlarge upon it here. Subsequent reflection has confirmed me in the opinion which I then entertained ; and applying the same principles to this case, I must pronounce the contract usurious.
The transaction of January 16th, 1841, cannot be distinguished from the one of the 6th, and must also be deemed usurious. The subsequent contracts were merely renewals of those two, and are infected with the taint by which they were pervaded.
A similar arrangement is set up in the answer, as made on the 16th of June, 1841; under which it is claimed that the defendants may retain the securities which they hold, inasmuch as the bill does not charge it to be usurious. It appears by the answer and testimony, that a renewal was agreed upon on the 16th of June, but it was never carried out so as to cancel or extinguish the contract of April 16th. No new note or contract was executed, and that of 16th April is still held by the defendants. The parties proceeded so far towards the renewal, that the Banking Company paid to De Launay & Co. bills for F. 167,995 12-100ths, and received from them their bills for F. 156,000. As this reduced the debt, the defendants suffered nothing by reason of the arrangement being broken off. There is no doubt that the note of 16th April is still out-standing, and the securities in question are held under it by the defendants.
As to the point that the relief to be granted in these cases is to be limited to declaring the security to be void, and enjoining its prosecution, and that the court, under the statute, cannot *311 direct the delivery up of the collaterals; 1 cannot accede to the position.
The relief provided in the fifth section of the act of 1837, does not preclude the court from granting general relief under the preceding section. It would be singularly incongruous, so to construe the statute, that a man who had no collateral security for a usurious debt shall lose it, while one who has such collaterals may retain the security, though he shall cancel the principal debt. I think the act leads to no such absurdity, and the contract being void, every thing that the lender has obtained by the contract, must be given up. He has no right to retain a collateral security held upon such a contract; and the court having jurisdiction to annul the latter, will not stop short half way, and leave him in possession of the former. (1 Story’s Eq. Jur. § 64 k; 2 ibid. § 699, 700.)
The complainant is entitled to a decree for the delivery to him of the contract of 16th April, 1841, and all the state stocks, bonds and other securities which the defendants held for its payment, when this suit was commenced, or which had not before that time been actually sold, and the proceeds applied towards such payment. But he is not entitled to a decree for the re-payment of any of the moneys which the defendants had received and applied on their debt before the suit was brought; the payments made, falling short of the principal sums loaned and legal interest.
The defendants must pay the costs of the suit.
Decree accordingly.(a)

 Th6 ease was reported in 1847, in 7 Hill, 391.

 Sinpe reported in 2 Sand. Ch. R, 149.

 How reported in 3 Sand. Ch. R. 313.

 Now reported, 3 Sand. Ch. R. 215.

 This decree was reversed, and the bill dismissed, by the Supreme Court m the first district, after this volume was put to press; on the ground exclusively, that the arrangement of June 16,1840, was a renewal of the previous agreement of April 16, and as the bill did not charge that arrangement to be usurious, it is to be treated as valid, and the defendants were entitled to hold the securities, until they were paid according to the same. The cause is now pending in the Court of Appeals, on an appeal fiom the decree of the Supreme Court.